JOURNAL ENTRY AND OPINION
Defendant-appellant Durrond Logan appeals from his convictions on two counts of aggravated murder and one count of aggravated robbery, all with firearm specifications.
Appellant contends his trial counsel were ineffective both for their failure to challenge the police stop of him that led to his arrest and for their failure to request a limiting instruction to the jury concerning the admission into evidence of certain statements made by a witness. Appellant further contends the admission of the statements and the lack of a limiting instruction also constituted error on the trial court's part. Finally, appellant asserts his convictions rested upon insufficient evidence.
This court has reviewed the record and finds appellant's contentions are unsupported; therefore, his convictions are affirmed.
Appellant's convictions stem from an incident that occurred at approximately 2:00 a.m. on January 22, 1998. The victim, Ronnie Jackson, had stopped an hour earlier at a restaurant located at East 69th Street and Superior Avenue to order some food. The owner of the restaurant, George Boyd, recognized Jackson because he was a customer who would "come into the store three, four times a week."[1] Boyd knew Jackson drove a Mercedes automobile and "always, had money on him," which he carried as a "bundle" in his pocket rather than in his wallet. Jackson placed the order, left for "maybe 20, 30 minutes," then returned to finish his wait for the food.
Upon Jackson's return, Boyd noticed that a woman followed him into the store. As Jackson sat down, the woman approached him, and the two began to converse. Boyd paid little attention to most of what the two said to each other, but after Jackson had paid for his order and was preparing to leave, Boyd heard the woman say "something like, are you going to do it or not?" Boyd then observed the two leave together.
As these events were occurring, Herman Thomas, who lived in the first floor apartment of a house located at 2192 East 101st Street, was walking to his home after purchasing cigarettes at a nearby gasoline station when he observed a man "pacing in front of the house, back and forth." Thomas remained across the street and called out to the man, "who was he looking for?"
The man was wearing a long, black trench coat over dark clothing. He mentioned someone named "Janice." Thomas was aware no one by that name lived in any of the apartments; therefore, his suspicions were aroused. Thomas answered the man's queries while he waited for the man to leave. After approximately five minutes, the man began to walk away. Thomas observed a car proceeding in the opposite direction on the street, which stopped for a moment by the man, then continued. The man saw Thomas still was watching, so he called out that he was waiting for "[his] ride to come back and pick [him] up."
Thomas crossed the street to his house after the man resumed walking. Thomas went indoors, woke his second-floor neighbor, Adrian Holmes, in order to warn him of the suspicious man, then returned to his porch to further monitor the man's movements. At that point, another car stopped in front of the house.
The car contained a male driver and a female passenger. The woman in the car demanded to know what Thomas was "doing standing on her porch?" Thomas, who was already tense and did not recognize the woman as a resident of the house, began arguing with her. The woman soon turned to her companion and stated something; the car thereupon continued a short distance on the street before turning around and parking on the northbound side of the street. Thomas, at that point, re-entered his apartment.
Holmes, although he had noticed the "black male in a dark long coat" Thomas had pointed out to him, also saw the male had "walked away," so he did not remain outdoors. Thomas's subsequent argument with the woman, whom Holmes recognized as Natasha Dyer, a friend of Neeka Penn, his third-floor neighbor, only briefly drew him back to his porch. Approximately five minutes later, however, Holmes heard the car that had been parked on the opposite side of the street "revving."
The noise aroused Holmes' curiosity. He looked out his apartment window to the street and saw the car suddenly "speed off full speed." As he watched, the car went "straight down the street" toward Cedar Road. The car did not slow down as it crossed Cedar Road and headed for the Cleveland Clinic's property. By the time Holmes ran outside to his porch, the car had crashed into the building that stood on the property.
The female passenger in the car, Natasha Dyer, struck her head on the windshield upon the car's impact with the building. She was dazed as she exited it, reaching for her purse and then "staggering" toward her friend's house.
Dyer's friend, Neeka Penn, lived on the third floor of the house with her uncle, Lucky Penn, and her children. Penn was returning from escorting another friend to a nearby bus stop when she saw Dyer approach the house. Penn saw that Dyer "had blood all over her." In response to Penn's anxious inquiries about what had happened, Dyer told her, "A man just got his head blew off."
Penn helped Dyer into the house, whereupon Dyer asked for a telephone. Holmes produced his portable telephone for Dyer's use; she entered a number but received no response. Penn then took the telephone and called the emergency number.
At the Cleveland Clinic, a security officer, Hach Q. Pham, had heard the car crash through the security fence that encircled the perimeter of the property and then strike the building. He could see the vehicle from his vantage point in the guard outpost. Pham saw a "shadow" move from the car toward the opening in the fence. By the time he responded to the scene, only the driver remained in the car. Both the front and the rear doors on the passenger side of the car were slightly open.
Pham looked inside the car as he heard several zone cars of the Cleveland Police Department arrive at the scene. Pham saw the driver, later identified as Ronnie Jackson, lying on the steering wheel, his left arm "dropped down" and his skull "completely open like a watermelon." The subsequent autopsy examination revealed Jackson had died as a result of a twelve-gauge shotgun discharge to the head at close range. Jackson had a corresponding hand wound, which indicated he had been attempting to seize the weapon from his assailant when it discharged. The gun's blast removed seventy-five percent of Jackson's brain from his head and deposited that portion in various areas inside the car. Although Jackson's wallet remained in his pocket, he had only fifty-nine cents on his person.
Since the driver obviously was dead, Pham circled the car for investigatory purposes. He found on the ground two items: near the rear passenger door, he observed a piece of matter later identified as a portion of the victim's brain and behind the car, he found an activated pager. Since the pager was not the type issued to Cleveland Clinic employees and the police officers also denied ownership, Pham replaced it on the ground for the police investigators. He noticed as he did so a functional "indicator"; thus, the unit still received calls.
Although initially responding to the scene of the crash, Cleveland Police Officer Richard Ubienski soon was notified the car's female passenger was nearby; therefore, he drove approximately three hundred feet from the scene to the house at 2192 East 101st Street. Although at that time EMS technicians were treating Dyer, Ubienski spoke briefly with her. Dyer indicated an unknown assailant had entered the car, apparently in an attempt to rob them; she could provide neither a description nor a name for the assailant. The technicians then transported Dyer to Mt. Sinai Medical Center for further treatment of her head injuries, accompanied by Neeka Penn.
Upon Dyer's arrival at the hospital, she made a telephone call from the pay telephone located in the emergency room. She made several more calls from the telephone located in the room to which she eventually was assigned.
Approximately one-half hour after Dyer had been taken to the hospital, a man, later identified as appellant, arrived at the Penns' door. Neeka's uncle permitted him to enter "because [he] knew [the man] was a friend of Tasha's." Although the outdoor temperature was only twenty-eight degrees, appellant was wearing "a sweat shirt and some shorts." Appellant was looking for Dyer; however, when he realized she would not be returning soon, he left.
The police interviewed Dyer concerning the incident later that day while she remained in the hospital. Once again, Dyer gave neither a suspect name nor a suspect description of the assailant.
During the days of January 22 and 23, 1998, police investigators traced both the identification number located on the pager found at the scene and the telephone numbers appearing on its screen. They discovered the pager had been purchased by appellant, using the name "Mr. King." They further discovered many of the calls made to the pager had originated from the telephones Dyer had utilized in the early morning hours following the incident.
On January 24, 1998, the police investigators decided to confront Dyer with this information. She was transported to the Justice Center for this purpose. Initially, Dyer repeated the version of the incident that she previously had given. Subsequently, however, as the investigators pressed her concerning the telephone calls she had made, she began to search through her purse in an attempt to locate an address. As she did so, several pieces of paper fell out.
The papers captured the attention of the investigators. They requested of Dyer to examine them; Dyer assented. One paper was a note dated "1-21-98" with a time placed on it of "11:48 p.m." It stated, "Trust me. I'll only love you, okay? Smile, Big Papa King."[2]
Since the investigators by this time were aware the pager found at the scene of the incident had been purchased by a "Mr. King" and that Dyer had repeatedly placed calls to the pager, they informed her she was now a suspect in Jackson's murder.
At 4:45 p.m., after Dyer was given her constitutional rights, she agreed to make a written statement. In her statement given to the police, Dyer presented the following version of the incident: she had been out with friends on the night of the incident and happened to enter Boyd's restaurant at the same time Jackson was obtaining his order. She and Jackson spoke briefly, then Jackson volunteered to take her home. Jackson turned around in the driveway, made a U-turn, and parked on the opposite side of the street. Just as she was preparing to exit the car, someone entered the rear passenger seat and pointed a shotgun barrel at Jackson. Jackson attempted to grasp the barrel of the gun to push it away; Dyer put her head down and observed Jackson's foot press down on the car's gas pedal. As the car accelerated, the assailant said to Dyer, "[Baby, stop the car or I'll kill both you m____r-f____rs. Dyer stated she attempted to steer the car as the men struggled, heard a shot, then the car crashed through a fence and into a wall. She struck her head on the windshield, so she was dazed. She exited the car, obtained her purse, noticed the rear door was open, and saw a man dressed in black fleeing across Cedar Road before she began walking toward the East 101st Street house. Dyer stated she recognized the assailant's voice as a "friend of [hers]" whose name she knew only as "King."
Dyer admitted she paged appellant several times that night. Although she indicated she was fearful of him, she further stated appellant took her home from the hospital. Dyer provided a description of the car appellant had been driving at that time, together with its license plate. Dyer also gave a description of another car she had seen appellant driving, together with its license plate.
Dyer stated she directly confronted appellant about the incident twice on January 23, 1998. The first time, appellant completely denied any participation, but the second time, appellant admitted to her he had tried to rob Jackson but "didn't mean to shoot him."
When Dyer's statement concluded at 5:50 p.m., she was arrested in connection with Jackson's murder. Appellant's name, address and description and a description of the two cars that he was believed to be driving, together with their license plates, were broadcast to police units in Cleveland, Cleveland Heights and Shaker Heights. At that time, appellant was sought for "questioning" in the murder while a warrant for his arrest was being prepared.
Soon thereafter, a Cleveland Heights police officer who was driving in the vicinity of an address used by appellant observed a car and license plate that matched one of the descriptions given by Dyer. The officer observed the driver also matched the description of appellant given over the police radio. Since the officer had information appellant lacked a valid driver's license, he stopped appellant's vehicle. Appellant was placed under arrest at approximately 8:20 p.m. When appellant arrived at the police station, he surrendered his personal possessions. A pair of gloves appellant had in his pocket later was tested by police forensic examiners; the surface of the right glove contained chemicals that were consistent with gunshot residue.
Appellant subsequently was indicted on four counts as follows: (1) aggravated murder, R.C. 2903.01 (A), with a felony murder specification, a three-year firearm specification, and a repeat violent offender specification; (2) aggravated murder, R.C.2903.01 (B), with a felony murder specification, a three-year firearm specification, and a repeat violent offender specification; 3) aggravated robbery, R.C. 2911.01, with a three-year firearm specification and a repeat violent offender specification; and (4) having a weapon while under disability, R.C. 2923.13.[3] Appellant entered pleas of not guilty to the charges and was assigned counsel to represent him.
The record reflects that approximately one week prior to the date of appellant's scheduled trial, Dyer entered into a plea agreement with the state whereby, in exchange for her truthful testimony at appellant's trial, the prosecutor would recommend the charges against her[4] would be reduced to a charge of involuntary manslaughter, R.C. 2903.04 (A).
Appellant's case proceeded to a jury trial on April 16, 1998.[5]
The state presented the testimony of twenty-eight witnesses in order to describe the events of the night of the incident and the subsequent police investigation that led eventually to appellant's arrest. One of the witnesses was Natasha Dyer.
Initially, Dyer's testimony was consistent with the written statement she had given to the police. As the prosecutor's examination of her proceeded, however, Dyer began to depart from that version of the incident: her testimony became increasingly exculpatory of appellant. Eventually, in an attempt to clarify Dyer's testimony, the prosecutor began to read from the statement Dyer gave to the police. Although defense counsel objected, the trial court permitted the prosecutor to examine Dyer with leading questions regarding only prior statements she had made that were consistent with her initial trial testimony.
Following Dyer's cross-examination by defense counsel, however, and also over defense counsels' objection, upon what ordinarily would have been redirect, the trial court further permitted the prosecutor to use Dyer's statement made to the police to cross-examine her regarding inconsistent statements she had made during her testimony.
Upon the conclusion of the state's presentation of its case in-chief, the trial court overruled appellant's motions for acquittal. Appellant presented one witness, a friend named Reman Smith, who stated he had seen appellant on the evening of January 21, 1998 in the company of Natasha Dyer. In his testimony, Smith indicated he had observed Dyer appropriate appellant's pager at approximately 10:00 p.m. but did not see her return it.
The jury ultimately returned a verdict of guilty on each count. The trial court found appellant guilty of the remaining count. Thereafter, the trial court sentenced appellant to consecutive terms of incarceration as follows: life with parole eligibility after twenty years for counts one and two; nine years on count three; three-year terms for each of the firearm specifications; eight years for the repeat violent offender specifications; and one year on count four.
Appellant has filed a timely appeal of his convictions. He presents five assignments of error f or review, which will be considered together when appropriate.
Appellant's first assignment of error states:
 APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN, FOR REASONS THAT CAN NEVER BE VALIDATED OR DEFENDED, TRIAL COUNSEL INEXCUSABLY FAILED TO FILE A MOTION TO SUPPRESS WHEN THE NEED FOR SUCH MOTION WAS CLEARLY MANIFEST.
Appellant argues his trial counsel were ineffective for their failure to file a motion to suppress the evidence obtained as a result of his arrest, most particularly the gloves he had in his pocket. Appellant's argument is unpersuasive.
In Ohio, a properly licensed attorney is presumed competent.State v. Smith (1985), 17 Ohio St.3d 98. One claiming ineffective assistance of counsel bears the burden of demonstrating the following: viz.; (1) there has been a substantial violation of an essential duty owed to him by counsel, and (2) he has been thereby prejudiced. State v. Lytle (1976), 48 Ohio St.2d 391;State v. Bradley (1989), 42 Ohio St.3d 136, citing Strickland v.Washington (1984), 466 U.S. 668; see, also, State v. Smith,supra. This court will not second-guess what could be considered to be a matter of trial strategy. Id. Moreover, the establishment of prejudice requires proof "that there exists a reasonable probability that were it not for counsel's errors, the result of the trial would have been different." State v. Bradley, supra,
syllabus 3.
The record of this case with regard to trial counsels' actions fails to demonstrate their performance fell below an objective standard of reasonableness. Defense counsel are not required to file a motion to suppress in every case. State v. Flors (1987),38 Ohio App.3d 133, headnote 2.
Appellant bases his argument on an assertion the police lacked probable cause to arrest him; however, a review of the record does not support his assertion.
Probable cause to conduct a warrantless arrest exists when police have, at the moment of arrest, sufficient knowledge of facts and circumstances grounded in reasonably trustworthy information to warrant a belief by a prudent person that an offense has been committed by the person to be arrested. Beck v.Ohio (1964), 379 U.S. 89. See, also, State v. Fultz (1968),13 Ohio St.2d 79, syllabus 1. Such facts and circumstances existed in this case.
In the evening hours of January 24, 1998, the police were aware the pager found at the scene of the murder was owned by appellant. They had learned that when he purchased the pager, appellant had listed his own address but had used the name "Mr. King." The police traced the telephone calls being placed to the pager on the night of the murder and thereby discovered many of the calls had been made by Natasha Dyer. Dyer was in possession of a note apparently written only two hours before the murder signed by "Big Papa King." Moreover, Dyer had just given a statement implicating appellant as the perpetrator of the killing. Furthermore, Dyer described as one of the vehicles she had seen appellant driving the one in which he was observed by the Cleveland Heights police officer. These facts amounted to probable cause to arrest appellant on January 24, 1998. State v.Bell (May 6, 1993), Cuyahoga App. No. 62325, unreported.
The record further reveals Dyer did not conclude her statement until 5:50 p.m. Appellant was observed by the police driving the vehicle just after 8:00 p.m.; therefore, there had been insufficient time for them to obtain an arrest warrant.
From the foregoing, it is clear the filing of a motion to suppress evidence gained as a result of appellant's arrest would have been fruitless. State v. Gibson (1980), 69 Ohio App.2d 91. Since counsel cannot be deemed ineffective for failing to file a motion to suppress when there is no justification for one, appellant cannot sustain his burden to prove counsel violated an essential duty to him. Id.; State v. Flors, supra; State v.Sanders (Dec. 10, 1996), Pickaway App. No. 95CA6, unreported; cf., State v. Garrett (1991), 76 Ohio App.3d 57. Moreover, the record reveals trial counsel were fully prepared and were capable, dingent advocates for their client.
Therefore, appellant cannot sustain his burden to prove trial counsel were ineffective. State v. Bradley, supra. Appellant's first assignment of error, accordingly, is overruled.
Appellant's second, third and fourth assignments of error are considered together as follows:
 II. THE COURT ERRED, NOT ONLY WHEN IT ALLOWED THE STATE UNDER THE ASSERTED AEGIS OF RULE 607, OHIO RULES OF EVIDENCE, TO DEVELOP FOR THE JURY THE ENTIRETY OF THE WRITTEN STATEMENT MADE BY ITS CHIEF WITNESS (NATASHA DYER) TO THE POLICE, BUT ALSO WHEN IT ALLOWED THE JURY TO CONSIDER THE VARIOUS COMPONENT STATEMENTS AS SUBSTANTIVE PROOF OF GUILT.
 III. THE COURT COMMITTED "PLAIN ERROR" WHEN IT DID NOT GIVE, AND COUNSEL FOR THE ACCUSED DID NOT PROVIDE, EFFECTIVE ASSISTANCE WHEN HE (sic) FAILED TO REQUEST A LIMITING INSTRUCTION WITH REFERENCE TO WHAT WAS SAID TO BE "PRIOR INCONSISTENT STATEMENTS" (ATTRIBUTED TO THE WITNESS NATASHA DYER) THAT WERE OFFERED UNDER FAVOR OF RULE 607 OF THE OHIO RULES OF EVIDENCE.
 IV. THE COURT COMMITTED "PLAIN ERROR" WHEN IT ADMITTED A CONSIDERABLE QUANTITY OF HEARSAY EVIDENCE, WHICH EVIDENCE ALSO VIOLATED THE APPELLANT'S RIGHT OF CONFRONTATION.
In these assignments of error, appellant argues the prosecutor's examination of Natasha Dyer using her written statement given to the police led to the admission of improper hearsay evidence. Appellant further argues his right to a fair trial was compromised when the jury was given no limiting instruction regarding the admission of this evidence. In this context of the entire record, appellant's arguments lack persuasiveness.
A review of the transcript of the relevant portion of appellant's trial reveals the prosecutor called Natasha Dyer as a witness immediately after linking appellant to the crime through appellant's purchase of the pager found at the scene. The prosecutor's direct examination of Dyer proceeded in a predictable manner for a lengthy period of time. Without implicating herself, Dyer merely outlined the facts surrounding the murder itself.
Eventually, the prosecutor came to the crucial portion of Dyer's testimony. Clearly, the prosecutor expected Dyer to testify appellant had made a statement to her admitting his role in the murder. At that point, however, in response to the prosecutor's question of whether she remembered what appellant stated when she asked him if he were the assailant, Dyer testified appellant told her, "No, it wasn't me. Then he said, "Yeah, it was me, but I didn't mean to rob him or kill him." (Emphasis added.)
Thereafter, Dyer became increasingly evasive and uncooperative in her direct examination. She denied having a romantic relationship with appellant despite acknowledging her possession of appellant's note. She also denied she personally had paged appellant during the hours immediately following the murder. Finally, she indicated that she had not heard appellant admit committing the crimes.
The prosecutor attempted to clarify the latter using Dyer's written statement to the police; defense counsel, however, objected to this procedure. The trial court thereupon ordered a sidebar conference. At the sidebar, the prosecutor stated he had been both surprised and affirmatively damaged by Dyer's testimony recanting appellant's admission to her. He requested permission to use Dyer's written statement to impeach her credibility pursuant to Evid.R. 607. He indicated he had reviewed Dyer's testimony with her shortly before calling her as a witness and that she had been cooperative at that time.
The trial court considered the arguments of counsel, together with its perception of Dyer's testimony. It then determined that the prosecutor could proceed pursuant to both Evid.R. 607 and Evid.R. 611 (C). During the subsequent examination, the trial court sustained defense counsels' objections to the prosecutor's use of any consistent statements Dyer had made.
Evid.R. 607 (A) provides:
RULE 607. Impeachment.
 (A) Who May Impeach. The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801 (D) (1) (a), 801 (D) (2), or 803.
Evid.R. 611 provides in pertinent part as follows:
RULE 611. Mode and Order of Interrogation and Presentation.
 (A) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, * * *
 (B) Scope of cross-examination. Cross-examination shall be permitted on all relevant matters and matters affecting credibility.
 (C) Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.
(Emphasis added.)
This court faced a similar factual situation in State v.Stearns (1982), 7 Ohio App.3d 11. In a case in which the witnesses called by the prosecution showed "a strong affinity to the defendant, * * * frequently gave incomplete or evasive answers, * * * differed significantly from statements * * * previously given * * * and also "affirmatively den[ied] the defendant's participation" in the crime, this court held a sufficient basis in the record existed to support the trial court's action.
Similarly, a review of the record in this case demonstrates the trial court did not abuse its discretion in permitting the prosecutor to ask leading questions of Dyer and limiting those questions to only prior inconsistent statements. State v. Clark
(May 4, 1994), Montgomery App. No. 13435, unreported; cf., Statev. Keenan (1993), 66 Ohio St.3d 402.
The foregoing does not end the inquiry, however. At the conclusion of the prosecutor's examination of Dyer, the trial court called a recess. Proceedings were about to resume when the trial court called a sidebar conference. The trial court placed on the record the fact that, as the jury returned to the courtroom, Dyer had confided to the judge her initial testimony on direct examination was "not the truth" — indeed, that her previous testimony was a lie." The trial court thereupon declared that since Dyer's comment coincided with "the defense's theory of the case," it would permit the parties "a broad range of cross- examination of this witness."
Subsequently, in response to defense counsels' questions, Dyer essentially testified that since she was coerced by the police into providing her written statement, much of it was false. Dyer thus became, in essence, a defense witness. Upon the conclusion of defense counsels' examination of Dyer, the prosecutor went over Dyer's written statement line by line in order to ascertain which statements she now repudiated. The trial court did not permit the written statement itself to be introduced into evidence.
From a review of the record, it is clear that after Dyer's repudiation of her direct testimony, the trial court proceeded pursuant to Evid.R. 614 (A).[6] Since Dyer's testimony by this point was essentially as a witness for the defense,[7] this was appropriate under the circumstances. State v. Dacon (1982),5 Ohio App.3d 112.
Furthermore, it is clear that in his "redirect" examination, the prosecutor used her written statement solely for purposes of impeachment rather than as an attempt merely to introduce improper hearsay evidence. State v. Jacobs (1995),108 Ohio App.3d 328; State v. Gant
(May 18, 1995), Cuyahoga App. No. 67199, unreported; cf.,State v. Riggins (1986), 35 Ohio App.3d 1;State v. Talbert (1986), 33 Ohio App.3d 282.
A review of the record further demonstrates defense counsel were in the enviable position during the crucial portion of the state's case-in-chief of obtaining, in Dyer, an unexpected witness to testify on appellant's behalf. Under these circumstances, defense counsels' failure to request an instruction informing the jury it was to place limited reliance on Dyer's testimony clearly was an appropriate trial tactic that cannot be faulted. State v. Bell, supra.
Moreover, since the trial court gave to the jury proper instructions regarding its role in evaluating the credibility of witnesses at the conclusion of appellant's trial, "plain error" does not exist in this case. State v. Davis (1992), 79 Ohio App.3d 450; cf., State v. Lewis (1991), 75 Ohio App.3d 689; Statev. Huff (Jan. 31, 1995), Hamilton App. No. C-930861, unreported.
For the foregoing reasons, appellant's second, third and fourth assignments of error are without merit and are, accordingly, overruled.
Appellant's fifth assignment of error states:
 THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE FINDING OF "GUILTY BEYOND A REASONABLE DOUBT."
Presenting an argument more relevant to a claim his convictions were against the manifest weight of the evidence, appellant essentially contends that the state failed to provide sufficient evidence to establish his guilt of the crimes and that, therefore, the trial court should have granted his motions for acquittal of the charges. This court does not agree.
According to Crim.R. 29 (A), a motion for judgment of acquittal shall be granted if the evidence is insufficient to sustain a conviction on the offense charged. If, however, reasonable minds could conclude each element of the offense has been proven beyond a reasonable doubt, the motion must be overruled. State v. Dennis
(1997), 79 Ohio St.3d 421, 430; State v. Bridgeman (1978),55 Ohio St.2d 261. An appellate court reviewing the denial of a Crim.R. 29 motion is required to view the evidence in a light most favorable to the prosecution. State v. Martin (1983),20 Ohio App.3d 172, 175.
Having thoroughly scrutinized the record, this court finds there was sufficient evidence presented by the state, if believed, to convince the average mind of appellant's guilt of the offenses charged beyond a reasonable doubt.
The state in this case relied mainly upon circumstantial evidence to prove appellant schemed to shoot and rob Jackson and then did so. Circumstantial evidence alone can be used to sustain even an aggravated murder conviction. As the Ohio Supreme Court has acknowledged, "* * * circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." Statev. Jackson (1991), 57 Ohio St.3d 29, 38. Thus, it was not error when the proof of guilt used to convict appellant was based in large part upon circumstantial, and not direct, evidence. Statev. Franklin (1991), 62 Ohio St.3d 118, 124; State v. Jenks
(1991), 61 Ohio St.3d 259, 272; State v. Nicely (1988). 39 Ohio St.3d 147;State v. Johnson (1978), 56 Ohio St.2d 35; State v.Robinson (1954), 161 Ohio St. 213.
The state presented the following circumstantial evidence of appellant's guilt in this case: (1) appellant and Jackson knew each other and were "associates" in some sort of enterprise in which they made significant amounts of money; (2) Jackson was known to carry a "bundle" of money in his pocket rather than in his wallet; (3) appellant, also known as "King," had a "love" relationship with Dyer, an eighteen-year-old girl; (4) Jackson was a friend of Dyer's father; (5) at 11:48 p.m. on January 21, 1998, appellant wrote a note to Dyer requesting her to "trust" him; (6) at approximately 1:45 a.m. on January 22, 1998, Dyer was seen in a restaurant with Jackson asking him if he was "going to do it or not?" before they left together; (7) Jackson drove Dyer home in his car; (8) at about this same time, a man dressed in black appeared to be waiting for someone in front of the house in which Dyer lived; (9) when Jackson arrived at the house, a man dressed in black entered the rear passenger seat of the car; (10) the man produced a shotgun and threatened Jackson with it; (11) Jackson struggled with the assailant, pressing the accelerator of the car as he did so; (12) the assailant called Dyer "Baby" and ordered her to stop the car; (13) Jackson was shot, the shot caused Jackson's head to explode, the car crashed, and a "shadow" was seen leaving the car; (14) Jackson had only a few coins in his pocket after he was killed; (15) appellant's pager was found on the ground near the rear passenger door of Jackson's car, together with a piece of Jackson's brain; (16) after the crash, Dyer almost immediately began making telephone calls that included an emergency number to appellant's pager; (17) appellant appeared at Dyer's house shortly after the incident seeking her and wearing shorts despite the winter temperature; and (18) when Dyer was confronted with the police investigators' knowledge that she was attempting to contact appellant after the incident, Dyer gave a written statement in which she indicated appellant admitted the murder of Jackson.
Viewing the foregoing evidence in a light most favorable to the prosecution, this court is of the opinion that reasonable minds could conclude each element of the two counts of aggravated murder and the count of aggravated robbery was proven beyond a reasonable doubt. State v. Sanderson (May 12, 1994), Cuyahoga App. Nos. 65378, 65379, unreported.
It can be inferred that appellant solicited from Dyer, his girlfriend, aid in "setting up" Jackson, that he was prepared to kill Jackson and then did so, that he took Jackson's "bundle" of money from Jackson's pocket prior to fleeing, and that Dyer was so unsettled by the outcome of the incident that she continually badgered appellant until he admitted his culpability to her in an effort to placate her.
A review of the record thus reveals ample circumstantial evidence such that reasonable minds could reach different conclusions as to whether each material element of the crimes was proven beyond a reasonable doubt. State v. Taylor (1993),66 Ohio St.3d 295; State v. Tinch (1992),84 Ohio App.3d 111; State v. McSwain (1992),79 Ohio App.3d 600; State v. Hardy (1978),60 Ohio App.2d 325; State v. Kiraly (1977),56 Ohio App.2d 37; cf., State v. Duganitz (1991),76 Ohio App.3d 363.
It is within the province of the jury to choose between competing constructions of the evidence, and an appellate court will not substitute its judgment for that of the jury. The trial court did not err in overruling appellant's motions for acquittal. State v. Jenks, supra, at 273; State v. Williams
(1976), 47 Ohio App.2d 330.
Accordingly, appellant's fifth assignment of error also is overruled.
Appellant's convictions are affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, P.J. and DIANE KARPINSKI, J. CONCUR.
 ________________________________ JUDGE KENNETH A. ROCCO
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] Appellant stipulated at trial that the handwriting on the note was his.
[3] The state deleted the specifications for felony murder prior to appellant's trial.
[4] Dyer was charged with two counts of aggravated murder and one count of aggravated robbery.
[5] Appellant elected to have count four tried to the bench.
[6] The relevant portion of that rule states:
 RULE 614. Calling and Interrogation of Witnesses by Court
 (A) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
[7] It is important to note in this context that the record reflects Dyer's decision, at the outset of her own trial as appellant's co-defendant, to accept a plea agreement with the state and to testify at appellant's trial as a witness for the state came as a "surprise" to appellant's defense counsel.