OPINION
{¶ 1} Appellant, Shawn Armstrong, appeals from a Trumbull County Court of Common Pleas jury verdict, finding him guilty of one count of aggravated murder, in violation of R.C. 2903.01(A), with a firearm specification, in violation of R.C. 2941.145. For the following reasons, we reverse appellant's conviction and remand this matter for further proceedings.
 {¶ 2} The record discloses the following facts. On the evening of August 9, 1998, the victim, Brad McMillan ("McMillan"), and his sister, Tracy Robinson ("Robinson"), visited the Elk's Lodge in Warren Township, Ohio. Robinson was initially hesitant in allowing McMillan to go out because McMillan had previously served as a confidential informant for the Trumbull County Drug Task Force and was scheduled to give testimony in an upcoming drug trafficking case. Ultimately, McMillan persuaded Robinson to join him for a night out at the Elk's Lodge.
 {¶ 3} The Elk's Lodge was located at 1919 Highland Avenue. Immediately adjacent and to the south of the Elk's Lodge was Cliff's Lounge. These two properties were separated by a small grass median. To the east and behind Cliff's Lounge was a small wooded area. Two blocks south of the Elk's Lodge was the Monument of Faith Church, which was positioned on the corner of Highland Avenue and Miller Street.
 {¶ 4} While Robinson and McMillan were inside the Elk's Lodge, McMillan was informed that an unidentified man wanted to see him in the parking lot. McMillan left Robinson and went outside to the parking lot.
 {¶ 5} Shortly after McMillan had left the club, Robinson went outside to check on him. Robinson found McMillan's body in the driver's seat of his car. He was dead with a bullet wound to the back of the head. Robinson immediately ran back into the Elk's Lodge and called 911 for emergency assistance.
 {¶ 6} Sergeant Edward Anthony ("Sgt. Anthony"), of the Warren Township Police Department, was patrolling the area near the Elk's Lodge on the night of the shooting. As he drove eastbound onto Miller Street, Sgt. Anthony noticed an occupied burgundy Pontiac that was parked with its lights off at the Monument of Faith Church parking lot. He watched the suspicious vehicle turn on its headlights and make a right turn northbound on Highland Avenue. Sgt. Anthony followed the Pontiac by turning right on Highland Avenue and radioed in the vehicle's license plate number. The Pontiac then turned into the parking lot of Cliff's Lounge. Sgt. Anthony continued northbound on Highland Avenue, still trying to obtain information on the suspicious vehicle. Before he obtained any information, he received a dispatch that a shooting had occurred at the Elk's Lodge.
 {¶ 7} A short time later, Patrolman Michael Merritt ("Ptlm. Merritt") arrived at the crime scene with Skyler, a trained tracking dog. After speaking briefly with Sgt. Anthony, Ptlm. Merritt checked the scene for contamination and then gave the command to search. Once Skyler came to the back of the deceased's vehicle, he detected a fresh track and began to follow it. Skyler first headed east toward the wooded area behind Cliff's Lounge and then proceeded south. Eventually, Skyler ended his track at the Monument of Faith Church parking lot.
 {¶ 8} Warren Township Police Lieutenant, Donald Bishop ("Lt. Bishop"), began the investigation by following up on the suspicious burgundy Pontiac which had been previously spotted in the church parking lot. Lt. Bishop learned that the burgundy Pontiac belonged to Ronald Peterson ("Peterson"), a Youngstown City police officer. Further investigation revealed that appellant had been staying at Peterson's home in Youngstown, Ohio, while Peterson was living with his parents in Warren. On August 10, 1998, appellant agreed to give a voluntary statement to Lt. Bishop.
 {¶ 9} In his statement, appellant explained that he had borrowed Peterson's car on the night of the homicide to visit his own family in Warren. Appellant stated that he went to the Elk's Lodge around midnight, but did not enter the club due to the entrance fee. Instead, appellant parked the car at Cliff's Lounge and began to roll a joint of marijuana. Appellant was about to smoke the joint when a man passing by informed him that there were undercover police officers nearby.
 {¶ 10} At this time, appellant maintained that he drove Peterson's car to the Monument of Faith Church parking lot and started to smoke marijuana. Appellant acknowledged that he saw a police car heading eastbound down Miller Street towards Highland Avenue. Appellant then stated that he exited the church parking lot and drove northbound on Highland Avenue with the police officer directly behind him. He further explained that he took a right turn into the Elk's Lodge parking lot and the police officer continued northbound on Highland Avenue. Appellant asserted that when he pulled into the Elk's Lodge he heard someone scream, "Brad is dead." Without exiting the car, he claimed he then drove to the back of the club and drove out of the parking lot.
 {¶ 11} Lt. Bishop continued his investigation by questioning Peterson and receiving his consent to search and tow his Pontiac. Peterson also surrendered an empty gun box that contained .45 caliber Speer Lawman ammunition. A casing recovered from the front seat of the victim's car matched this caliber and brand of ammunition. Lt. Bishop further discovered that on August 12, 1998, three days after the homicide, Peterson reported to the Youngstown City Police Department that his .45 caliber automatic pistol had been stolen from his residence.
 {¶ 12} During the pendency of the investigation, Lance Pough ("Pough"), the individual against whom McMillan had been scheduled to testify as a confidential informant, and Pough's friend, Art Bell, were already incarcerated due to federal drug trafficking charges. While incarcerated, both Pough and Art Bell entered into various agreements with the prosecution relating to the McMillan homicide investigation. Pough and Art Bell provided Detective Melanie Gambill ("Det. Gambill"), of the Warren City Police Department, with information regarding the murder. Specifically, Art Bell provided Det. Gambill with unsworn, out-of-court statements as part of his agreement, in which he confessed to his participation in the planning of the McMillan homicide. His statements also inculpated appellant as part of this murder-for-hire scheme. Ultimately, prior to appellant's trial, Art Bell was convicted in state court for his role in the McMillan homicide.
 {¶ 13} Thereafter, the investigation effectively stalled until March 30, 2000, when an Austintown police patrolman stopped the car of Edrick Davis ("Davis") and observed a round of ammunition and a clip in plain view. The patrolman investigated and found a gun next to the clip. The gun was later identified as Peterson's missing weapon. Further evidence was gathered which ultimately linked appellant to the gun that was found in Davis' car.
 {¶ 14} On May 9, 2000, appellant was indicted for one count of aggravated murder with specifications of aggravated circumstances and a firearm specification, in violation of R.C.2903.01(A), R.C. 2929.04(A)(8), and R.C. 2941.145. Appellant was also indicted on one count of conspiracy to commit aggravated murder with a firearm specification, in violation of R.C.2923.01(A)(1) and 2941.145. Before trial, the prosecution nolled the aggravated circumstances, and the trial court dismissed the conspiracy charge. As a result, appellant proceeded to a trial by jury on September 18, 2001, for one count of aggravated murder with a firearm specification.
 {¶ 15} During trial, Pough and Art Bell testified as to their involvement with the homicide. Pough testified that he had agreed to pay Carlo Eggleston ("Eggleston") $14,000 to have McMillan killed because McMillan was going to testify against Pough in a drug trafficking case. Eggelston was also a police officer with the Youngstown City Police Department and had been Peterson's partner. Pough testified that he had paid Eggleston $6,700 while in Art Bell's garage. Pough further stated he had given Eggleston the $6,700 that day, but knew none of the details surrounding the murder because, as he testified, "it was irrelevant to me really." Pough then testified that after Art Bell informed him of McMillan's death, Pough instructed Art Bell to "give the money to whoever is over there."
 {¶ 16} During his direct and cross-examination, Art Bell developed memory problems concerning his previous unsworn statements to Det. Gambill. As a result of Art Bell's lack of recollection, the prosecutor read aloud a series of statements, previously made to Det. Gambill, by Art Bell. In those unsworn statements, Art Bell confessed to his own role in the murder-for-hire scheme and inculpated appellant. After each incriminating statement was read, Art Bell testified that he did not remember making the statements. At no time did he acknowledge or deny the substance of those statements.
 {¶ 17} Kendra Bell, Art Bell's sister, testified that appellant visited the Bell family home on the day after the murder. Although she did not see any exchange of money, Kendra Bell testified that, at that time, Art Bell was there with an undisclosed amount of money.
 {¶ 18} In relationship to the gun, the following convoluted trail of evidence was laid. Vincent Thomas ("Thomas"), a resident of the Westlake Housing Project in Youngstown, testified that, after the murder, Josh Miller ("Miller") had approached him at his apartment in an attempt to purchase a gun. Thomas told Miller that he was not going to sell him a gun. At this time, a man outside of Thomas' apartment door approached Miller from behind and informed Miller that he had a gun for sale. Thomas then shut the door of his apartment. Lt. Bishop contacted Thomas and asked him to identify the man who approached Miller from an eight-man photo array. Thomas selected appellant's picture as the man who approached Miller regarding a gun for sale.
 {¶ 19} Additional testimony at trial established that, subsequent to McMillan's death, Miller had come into possession of the .45 caliber revolver used in the murder. He ultimately sold the gun to Darrin Lane ("Lane"). Lane then sold it to Darryl Cooper ("Cooper"). Cooper sold the weapon to Davis, who was ultimately pulled over by the Austintown patrolman. Firearms expert, Michael Roberts ("Mr. Roberts"), testified that a bullet fragment recovered from McMillan's skull matched a bullet that was discharged from the .45 caliber revolver recovered from Davis' vehicle.
 {¶ 20} Following the close of the case, the jury found appellant guilty of one count of aggravated murder, in violation of R.C. 2903.01(A), with a firearm specification, in violation of R.C. 2941.145. Appellant was sentenced to a prison term of twenty-three years to life.
 {¶ 21} On October 10, 2001, appellant filed a motion for a new trial and a renewed motion for acquittal. A hearing on the motion for a new trial began on January 18, 2002, but was continued after Thomas unexpectedly invoked his Fifth Amendment privilege. The court gave appellant leave to amend the motion for a new trial, explaining that once the new motion was filed, a second hearing date would be set.
 {¶ 22} Appellant filed a supplemental brief with affidavits on March 14, 2002, and the prosecution filed its response on April 10, 2002. On May 13, 2002, without a hearing, the trial court denied both appellant's motion for a new trial and his renewed motion for acquittal.
 {¶ 23} Appellant filed a timely notice of appeal and now sets forth the following eleven assignments of error for our review:
 {¶ 24} "[1] The trial court erred in admitting the identification testimony of Vincent Thomas in violation of defendant's state and federal right to due process.
 {¶ 25} "[2] The trial court erred and abused its discretion by admitting substantial amounts of inadmissible hearsay at trial, thus depriving the defendant of his rights to due process of law and to confront witnesses.
 {¶ 26} "[3] The trial court erred by preventing the defense from inquiring into Lt. Bishop's alleged threats and intimidation of Witnesses during the investigation of this case, thereby violating the defendant's rights to due process and to confront the witnesses against him.
 {¶ 27} "[4] The trial court erred and abused its discretion by denying the defendant's motion in limine to exclude dog tracking evidence, thus denying the defendant's right to due process of law and to confront witnesses.
 {¶ 28} "[5] The trial court erred by allowing a witness to testify as an expert on firearms identification without being qualified as an expert, and without the testimony passing theDaubert test, in violation of the defendant's right to due process and a fair trial.
 {¶ 29} "[6] The trial court erred and abused its discretion in denying the defendant's motion for new trial and failing to complete the hearing on the motion, thus depriving the defendant of his right to due process of law.
 {¶ 30} "[7] The defendant was denied his constitutional right to a fair trial and due process of law because of prosecutorial misconduct that unfairly prejudiced the defendant.
 {¶ 31} "[8] The defendant was denied his constitutional right to effective assistance of counsel when his attorney failed to protect his rights at trial.
 {¶ 32} "[9] The trial court erred in denying the defendant's rule 29 motion when the state failed to offer evidence sufficient to sustain a conviction.
 {¶ 33} "[10] The jury's decision was not supported by sufficient probative evidence.
 {¶ 34} "[11] The jury's verdict was against the manifest weight of the evidence."
 {¶ 35} For the sake of clarity, we will discuss appellant's assignments of error out of order. Under his first assignment of error, appellant contends that the trial court erred by denying his motion to suppress the identification testimony of Thomas. Appellant maintains that the eight-man photo array used by the prosecution to obtain Thomas' identification of appellant was unduly suggestive and created a substantial likelihood of misidentification.
 {¶ 36} At a hearing on a motion to suppress, the trial court functions as the trier of fact. Accordingly, the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. State v.Mills (1992), 62 Ohio St.3d 357, 366. On review, an appellate court must accept the trial court's findings of fact if those findings are supported by competent, credible evidence. State v.Retherford (1994), 93 Ohio App.3d 586, 592. After accepting such factual findings as true, the reviewing court must then independently determine, as a matter of law, whether or not the applicable legal standard has been met. Id.
 {¶ 37} First, we note that even if the identification procedure contains notable flaws, this alone does not necessarily preclude the admissibility of the subsequent incourt identification. State v. Moody (1978), 55 Ohio St.2d 64, 67, citing State v. Barker (1978), 53 Ohio St.2d 135, 142-143. In order to suppress identification testimony, there must be "`a very substantial likelihood of irreparable misidentification.'"State v. Jells (1990), 53 Ohio St.3d 22, 27, quoting Simmonsv. United States (1968), 390 U.S. 377, 384.
 {¶ 38} Here, appellant claims that the procedure used by the police was unduly suggestive for the following reasons: (1) he was the only light skinned black man among the men depicted in the photos; (2) one of the photos depicted a man in a police uniform; and (3) one of the photos showed a man with a bald head. Further, appellant argues undue prejudice existed, as the photos included only suspects in the instant case.
 {¶ 39} After careful examination, we find that the photo array used by the police was not unduly suggestive. Our review of the photo array shows that at least one of the other men actually had a similar, if not the same, skin tone as appellant. Even if appellant had the lightest complexion of the six men, the procedure still was not unduly suggestive because "`there was not such a significant difference in skin tones to make the distinction prejudicial.'" State v. McDade (Sept. 25, 1998), 11th Dist. No. 97-L-059, 1998 WL 682360, at 6, quoting State v.Cox (May 23, 1997), 11th Dist. No. 95-T-5279, 1997 Ohio App. LEXIS 2244, at 25. See, also, State v. Johnson (Sept. 24, 1999), 11th Dist. No. 97-T-0227, 1999 WL 778383, at 4. The eight photographs in the array all depict eight similar black males, who were roughly the same age, with short hair, unremarkable complexions, and facial hair.
 {¶ 40} Appellant's contention that the photo array was unduly suggestive because only suspects were used is misguided. As stated previously, the linchpin of our review is whether the identification procedure employed was so impermissibly suggestive it gave rise to a substantial likelihood that the identification was unreliable. See, e.g., Neil v. Biggers (1972),409 U.S. 188. The fact that only suspects were used as part of the photo array is irrelevant to the suggestiveness of the photos. It cannot be said that the use of suspects caused Thomas' identification to become unreliable. See, e.g., Neil; McDade.
To the contrary, the physical characteristics of the eight men depicted in the photo array fail to demonstrate that Thomas based his identification upon the use of unduly suggestive photographs.State v. Green (1996), 117 Ohio App.3d 644, 652-653. See, also,McDade.
 {¶ 41} Having carefully considered the record, we conclude that the photo array employed by the Warren Township Police Department was not unduly suggestive, and that the trial court did not err in overruling appellant's motion to suppress. Accordingly, because appellant has not demonstrated that the photo array was unduly suggestive, there is no need for this court to analyze the totality of the circumstances to determine the reliability of the identification testimony. Appellant's first assignment of error is without merit.
 {¶ 42} Appellant's fourth assignment of error contends that the trial court erred by denying his motion in limine to exclude dog tracking evidence. Initially, appellant argues that the dog tracking evidence is inadmissible under Evid.R. 702, and relevant common law. Appellant maintains that in Kumho Tire Co., Ltd. v.Carmichael (1999), 526 U.S. 137, 147, the United States Supreme Court extended the parameters of expert witness testimony to include the testimony of a dog-handler. Accordingly, appellant submits that a dog-handler's testimony is only admissible if it satisfies the reliability requirements set forth in Evid.R. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993),509 U.S. 579. Because these prerequisites were not established during the motion in limine hearing, appellant asserts that the trial court erred in admitting Ptlm. Merritt's dog tracking testimony
 {¶ 43} At the outset, we note that appellant has effectively waived any error on appeal with respect to the trial court's denial of his motion in limine due to his failure to renew his objection at trial. It is well-settled under Ohio law that the granting of a motion in limine is not a final appealable order because such an order does not determine the ultimate admissibility of the evidence. See, e.g., Stevens v. Provitt,
11th Dist. No. 2002-T-0076, 2003-Ohio-7226, at ¶ 39. As a result, appellant was required to renew his objection to Ptlm. Merritt's testimony at trial to preserve such objection for appellate review. See, e.g., State v. Grubb (1986), 28 Ohio St.3d 199, paragraph two of the syllabus.
 {¶ 44} That being said, we further recognize that the foundational prerequisites which are required before a dog-handler's testimony will be admitted, act as a sufficient gate-keeper to exclude unreliable dog tracking evidence. Ohio is one of a number of states which allows the admission of evidence of trailing by a tracking dog. State v. Weber (1997),124 Ohio App.3d 451. "[B]efore evidence of dog trailing may be admitted, the training and reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the trailing by the dog must be shown." State v. Bridge (1989),60 Ohio App.3d 76, 78. If the foregoing foundational requirements are demonstrated by the dog-handler, the dog-tracking evidence may be properly admitted.
 {¶ 45} As mentioned previously, Ptlm. Merritt gave a substantial amount of testimony regarding his qualifications as a dog-handler, and the training and reliability of Skyler. Moreover, Ptlm. Merritt more than adequately described the circumstances surrounding Skyler's track. Ptlm. Merritt testified that he checked for contamination of the crime scene and initiated Skyler's search near the back passenger seat and rear of the vehicle. Ptlm. Merritt began the search in this area because crime scene evidence demonstrated that the shooter was in the back of McMillan's car. At the rear of the vehicle, Skyler signaled that he had found a track and followed the track to the Monument of Faith Church parking lot.
 {¶ 46} It is clear that the necessary foundational requirements to admit dogtracking evidence were satisfied. Thus, for this additional reason, the trial court did not err in admitting Ptlm. Merritt's testimony.
 {¶ 47} Appellant also argues that Ptlm. Merritt's testimony is inadmissible because it precludes appellant from effective cross-examination. In support of this contention, appellant states that Ptlm. Merritt's testimony was necessarily based on the opinion and behavior of Skyler and, therefore, was not subject to cross-examination.
 {¶ 48} As stated previously, Ohio has an extended history of accepting a doghandler's testimony. See, e.g., State v.Dickerson (1907), 77 Ohio St. 34. Furthermore, it is obvious from the record that appellant was able to vigorously cross-examine Ptlm. Merritt regarding the possibility of error during Skyler's track. Thus, this portion of appellant's fourth assignment of error is not well-taken.
 {¶ 49} Based upon the foregoing analysis, appellant waived his objection to the admissibility of Ptlm. Merritt's testimony and has failed to demonstrate that the trial court erred in admitting such testimony. Appellant's fourth assignment of error is without merit.
 {¶ 50} Appellant's fifth assignment of error contends that the trial court erred by failing to exclude Mr. Roberts' expert witness testimony, matching the bullet recovered from Peterson's gun to a bullet fragment retrieved from McMillan's body. Appellant contends that Mr. Roberts' testimony did not satisfy the Daubert reliability factors.
 {¶ 51} As an initial matter, we note that appellant failed to object to Mr. Roberts' testimony during trial. Under Evid.R. 103(A), error may not be predicated upon a ruling which admits evidence unless "a timely objection or motion to strike appears of record stating the specific ground of objection[.]" "An enduring principle of appellate review is that a party waives an error that it fails to preserve through an objection at trial."State v. Aldridge (1997), 120 Ohio App.3d 122, 154. Thus, appellant has waived this error on appeal.
 {¶ 52} Assuming arguendo that appellant had stated a proper objection and preserved this issue for appeal, it is clear that Mr. Roberts' testimony was reliable and properly admitted. A trial court's ruling as to the admission or exclusion of expert testimony is within its broad discretion and will not be disturbed absent an abuse of that discretion. State v. Tomlin
(1992), 63 Ohio St.3d 724, 728. An abuse of discretion is more than an error of law or judgment; rather, it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. State v. Bresson (1990), 51 Ohio St.3d 123,129.
 {¶ 53} As stated previously, Evid.R. 702 governs the admissibility of expert witness testimony, to wit:
 {¶ 54} "A witness may testify as an expert if all of the following apply:
 {¶ 55} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 56} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 57} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 58} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 59} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 60} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 61} Mr. Roberts' testimony clearly established his qualifications as an expert in the science of general ballistics and tool-mark analysis. Furthermore, his testimony dealt with a complex area of expertise which a lay person would commonly have no knowledge. Accordingly, the requirements of Evid.R. 702(A) and (B) have been satisfied, and our review is focused solely upon the reliability of Mr. Roberts' testimony pursuant to Evid.R. 702(C).
 {¶ 62} In Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607, 611, the Supreme Court of Ohio adopted the following four reliability factors first articulated in Daubert: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. See, also, Daubert at 593-594.
 {¶ 63} Although the following factors were determined to be useful in testing a theory or a procedure's reliability, the reliability requirement of Evid.R. 702(C) is a "threshold determination," focusing on the scientific evidence and its underlying principles, not on the accuracy of the ultimate conclusions. Daubert at 595; Miller at 611-612. "[T]he reliability requirement of Daubert should not be used to exclude all evidence of questionable reliability, nor should a court exclude such evidence simply because the evidence is confusing." Miller at 614. Instead, the "`ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's "technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results."'" Id., quoting DeLuca v.Merrell Dow Pharmaceuticals, Inc. (C.A.3, 1990), 911 F.2d 941,956, quoting 3 Weinstein's Evidence (1988) 702-35, Section 702[3].
 {¶ 64} At trial, Mr. Roberts' testimony centered upon tool-mark analysis. He explained that tool-mark analysis consisted of a comparison of small ridges engraved in a bullet, after it had been fired, to the markings within the gun barrel. Mr. Roberts stated that each gun barrel has a unique set of grooved ridges within the barrel. Due to these barrel grooves, a bullet is engraved with distinct markings which allow it to be matched to a specific gun.
 {¶ 65} Mr. Roberts' testimony at trial established that the procedures he employed during his tool-mark analysis did not negate its reliability. Specifically, he stated that the suspect weapon was test fired on numerous occasions and he compared the test fired bullets with the bullet recovered from McMillan. The overall reliability of the tool-mark analysis was further bolstered based upon Mr. Roberts' testimony describing the use of a water tank to reduce damage or abrading to the comparison bullets.
 {¶ 66} The testimony given by Mr. Roberts confirms that the tool-mark analysis technique is sufficiently reliable to aid the jury in reaching accurate results. We need not determine whether the results of the tool-mark analysis were accurate to Mr. Roberts' ultimate conclusion that the bullet fragment recovered from McMillan was fired from Peterson's gun. The accuracy of Mr. Roberts' ultimate conclusion is a matter best left for the jury to determine after weighing the evidence presented. As to the threshold determination of admissibility, however, the trial court properly admitted Mr. Roberts' expert witness testimony. Appellant's fifth assignment of error is without merit.
 {¶ 67} Under his second assignment of error, appellant contends that the trial court erred by allowing the prosecution to use the prior unsworn statements of Art Bell, not only for impeachment purposes, but also as substantive evidence. Thus, appellant asserts that his rights to due process of law and confrontation were violated.
 {¶ 68} As previously indicated, the prosecutor called Art Bell as a witness on direct-examination. Throughout his direct-examination, Art Bell consistently expressed uncertainty and a lack of recollection as to his prior, unsworn statements concerning the factual events of the murder for hire scheme. Consequently, the prosecutor requested that Art Bell be declared a hostile witness so he could be impeached with these earlier statements to Det. Gambill. The trial court took a short recess to discuss the matter with counsel in chambers. When trial resumed, the jury was informed that Art Bell's testimony would be continued at a later time.
 {¶ 69} Subsequently, Art Bell took the stand for direct-examination by the prosecution. There is no indication that Art Bell was ever declared a hostile witness. During direct-examination, the prosecutor proceeded to read individual portions of Art Bell's earlier statements to Det. Gambill. Following the reading of each statement, the prosecutor asked Art Bell whether he remembered giving the specific statement. Art Bell continuously answered that he did not remember giving the statements.
 {¶ 70} We first note that appellant failed to object either to the court's failure to declare Art Bell a hostile witness, to the prosecutor's reading of Art Bell's prior statements, or to the absence of any limiting instruction relating to Art Bell's prior statements. Therefore, our examination of appellant's contentions will be made pursuant to a plain error analysis. Crim.R. 52(B).[1]
 {¶ 71} That being said, the majority of the statements read by the prosecutor were merely cumulative of prior testimony given by Pough. However, of significance on appeal is the reading of those portions of Art Bell's prior statements to Det. Gambill that directly connected appellant to the murder-for-hire scheme. The following passages demonstrate these relevant portions of testimony:
 {¶ 72} "Q: Do you remember stating in response to a question I had asked you, `Do you know who, who if anyone had anything to do with [McMillan] being killed?'
 {¶ 73} "And do you remember stating, `Oh, Lance Pough, uh Carlo Eggleston and [appellant]'?
 {¶ 74} "A: No. I don't remember.
 {¶ 75} "Q: You don't remember making that statement?
 {¶ 76} "A: No.
 {¶ 77} "Q: And do you remember in reply to this question, `Okay those are the three individuals that you have knowledge participated in some form in the death of Brad McMillan'?
 {¶ 78} "And your answer being, `Yes'?
 {¶ 79} "* * *
 {¶ 80} "Q: You don't remember saying that?
 {¶ 81} "A: No.
 {¶ 82} "* * *
 {¶ 83} "Q: My question to you. `Well let me ask you this, when, when you give the money to [appellant], why do you think you're giving it to [appellant]?'
 {¶ 84} "* * *
 {¶ 85} "`I guess he owed, he just, [inaudible], owe some money so I guess [appellant] got something to do with it, that's why I given him the money. More likely he got;' do your remember telling me that?
 {¶ 86} "A: No.
 {¶ 87} "* * *
 {¶ 88} "Q: `And you also believe that [appellant] must have had something to do with [McMillan's murder] because he picked up the money after the fact'?
 {¶ 89} "`Right[.]'
 {¶ 90} "Q: Do you remember saying that?
 {¶ 91} "A: No."
 {¶ 92} At no time during direct or cross-examination did Art Bell provide additional substantive testimony which directly linked appellant to the murder of McMillan. On cross-examination, Art Bell again testified that he had no recollection of making any of the specific statements to Det. Gambill.[2]
 {¶ 93} With a proper foundation and a proper limiting instruction, the prosecution could have used Art Bell's prior unsworn statements for impeachment purposes under Evid.R. 613(B). Unfortunately, no such foundation was laid, and no such instruction was given. Evid.R. 613(B) states:
 {¶ 94} "Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
 {¶ 95} "(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
 {¶ 96} "(2) The subject matter of the statement is one of the following:
 {¶ 97} "(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;
 {¶ 98} "(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), 616(B) or 706;
 {¶ 99} "(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence."
 {¶ 100} Despite the mandates of Evid.R. 613(B), Evid.R. 607(A) states, "[t]he credibility of a witness may be attacked by any party except that the credibility of a witness may beattacked by the party calling the witness by means of a priorinconsistent statement only upon a showing of surprise andaffirmative damage." (Emphasis added.)
 {¶ 101} Here, Art Bell was called as the prosecution's witness. As stated previously, Art Bell was never declared a hostile witness. Nevertheless, it was the prosecution that used Art Bell's unsworn statements in an apparent attempt to impeach him. Therefore, as required by Evid.R. 607, the prosecution was required to demonstrate surprise and affirmative damage.
 {¶ 102} In the case sub judice, the prosecutor informed the trial court that it had not spoken with Art Bell since he had given his statements. The prosecutor further stated that it had no reason to believe that Art Bell would be unable to testify in accordance with his prior statements. Moreover, there is no evidence showing that the prosecution was aware that Art Bell would testify that he could not recollect the substance of his prior statements. As a result, the prosecution established that the testimony provided by Art Bell was a surprise. See, e.g.,State v. Davie (Dec. 27, 1995), 11th Dist. No. 92-T-4693, 1995 Ohio App. LEXIS 6064, at 83-84
 {¶ 103} Notwithstanding the establishment of surprise, the prosecution must also demonstrate that Art Bell's testimony affirmatively damaged its case. "Affirmative damage can be shown if the party's own witness' testimony contradicts, denies, or is harmful to that party's trial position." Davie at 84. A non-harmful neutral answer, such as "I don't know" or "I can't remember[,]" does not show affirmative damage, as such answers fail to contradict or deny a prior statement. See, e.g., Statev. Keenan (1993), 66 Ohio St.3d 402, 412. See, also, Staff Note to Evid.R. 607, ("Requiring a showing of affirmative damage is intended to eliminate an `I don't remember' answer or a neutral answer by the witness as a basis for impeachment by a prior inconsistent statement.")
 {¶ 104} As established by the aforementioned portions of Art Bell's testimony, at no time did he contradict or deny his inculpatory statements. Instead, he merely testified that he could not remember making the statements. This type of neutral answer fails to establish the affirmative damage necessary for the prosecution to impeach its own witness under Evid.R. 607.
 {¶ 105} The dissent relies upon State v. Wilbon, 8th Dist. No. 82934, 2004-Ohio-1784, at ¶ 26; State v. Baker (2000),137 Ohio App.3d 628, 651; State v. Hartman (Apr. 5, 1999), 12th Dist. No. CA98-06-040, 1999 Ohio App. LEXIS 1476, at 16-17; andState v. Marsh (Sept. 30, 1985), 12th Dist. No. CA84-11-080, 1985 Ohio App. LEXIS 7189, at 13, in an attempt to demonstrate that the requisite foundation for affirmative damage was established by Art Bell's lack of recollection regarding his prior inculpatory statements. Such reliance is misplaced.
 {¶ 106} Neither Wilbon, Baker, Hartman, nor Marsh
required a showing of affirmative damage. In each case, the prosecution was not attempting to impeach its own witness.[3] Instead, these various holdings only indicate that lack of memory is a proper foundation to impeach a witness with extrinsic evidence per Evid.R. 613(B). Evid.R. 607 was not applied in these cases; thus, the respective holdings of each case are irrelevant to the establishment of affirmative damage.
 {¶ 107} Here, the failure to declare Art Bell a hostile witness and the failure to establish affirmative damage rendered Evid.R. 607 inapplicable. As a result, Art Bell's prior statements could not be admitted for impeachment purposes. Under no theory or rule were these out-of-court statements admissible as substantive evidence.
 {¶ 108} Moreover, we are not persuaded that any error with respect to the improper admission of Art Bell's statements under Evid.R. 613(B) can be considered harmless. Art Bell's prior statements were the only submissions which directly linked appellant as the hit-man in the murder-for-hire scheme. See, e.g., State v. Lewis (1991), 75 Ohio App.3d 689, 697. Although there was some broad-brush, circumstantial evidence which connected appellant to the murder, without Art Bell's prior statements, there was no other direct link between him and the murder-for-hire scheme.
 {¶ 109} Even if the error in admitting Art Bell's prior statements was somehow construed as harmless error, the court's failure to issue a limiting instruction on the use of impeachment evidence was fatal and plain error. Statements admitted under Evid.R. 613(B) require a limiting instruction to inform the jury that the prior statements were only to be considered for impeachment purposes. See, e.g., Evid.R. 105. The absence of such an instruction created further prejudice as it allowed the jury to consider Art Bell's prior statements as substantive evidence when determining appellant's guilt.
 {¶ 110} As a result, the prosecutor's reading of Art Bell's statements violated appellant's constitutional right to confront a witness under the Sixth Amendment of the United States Constitution. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."[4] "[A] major reason underlying the constitutional confrontation rule is to give a defendant charged with a crime an opportunity to cross-examine the witnesses against him." Pointer at 406-407.
 {¶ 111} The instant case is analogous to Douglas v. Alabama
(1965), 380 U.S. 415. In Douglas, two individuals, Loyd and Douglas, were accused of assault with intent to murder and were tried separately. Loyd was tried first and found guilty. Subsequently, at Douglas' trial, Loyd was called as a witness against Douglas. Because an appeal was pending from his earlier conviction, Loyd invoked his right against self-incrimination and refused to answer any questions. As a result, the prosecution was permitted to treat Loyd as a hostile witness. Under the guise of refreshing Loyd's recollection, the prosecutor proceeded to read Loyd's purported confession in the presence of the jury. Specifically, the prosecutor would read a small portion of Loyd's confession and would ask, "[d]id you make that statement?" Each time, Loyd asserted his right against self-incrimination and refused to answer. Various statements contained within Loyd's confession were relevant to Douglas' trial as they named Douglas as the person who fired a shotgun blast which wounded the victim.Douglas at 416-417.
 {¶ 112} Ultimately, in Douglas, the United States Supreme Court held that Douglas' inability to cross-examine Loyd denied him the right of cross-examination secured by the Confrontation Clause. Id. at 419. The Court expressly stated:
 {¶ 113} "Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true. * * * Since the Solicitor was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to but not admitted by him." (Internal citations omitted.) Id.
 {¶ 114} Based upon the foregoing, the Court reasoned that "effective confrontation of Loyd was possible only if Loydaffirmed the statement as his." (Emphasis added.) Id. at 420. Because Loyd refused to acknowledge the statements as his, Douglas was precluded from any useful cross-examination. Id. The Court reversed Douglas' conviction, concluding that "[t]his case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. The alleged statements clearly bore on a fundamental part of the State's case against petitioner. The circumstances are therefore such that `inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" Id., quoting Namet v. United States (1963),373 U.S. 179, 187.
 {¶ 115} In the instant case, Art Bell was convicted for his role in the McMillan homicide prior to appellant's trial. During appellant's trial, the prosecutor read various portions of Art Bell's prior statement which inculpated appellant. Although Art Bell did not assert his right against self-incrimination, he did continuously fail to affirm or confirm the inculpatory statements as his. Due to Art Bell's failure to acknowledge the statements as his, appellant was denied the ability to effectively cross-examine Art Bell on these inculpatory statements. Thus, the prosecutor's reading of the statements in this manner violated the Confrontation Clause under the Sixth Amendment of the United States Constitution.
 {¶ 116} The dissent incorrectly maintains that appellant's right to confront the witness was not violated. We acknowledge that Art Bell's cross-examination testimony admitted that he, at some point in time, spoke with Det. Gambill and that during this discussion appellant was mentioned. However, at no time did Art Bell assert ownership or "disavow" making these inculpatory statements.
 {¶ 117} The holding of Douglas was not based upon Loyd's invocation of the Fifth Amendment. To the contrary, the holding was grounded solely upon Loyd's refusal to assert ownership of those statements which directly inculpated Douglas. Id. at 419-420. Without Loyd's assertion of ownership, it was impossible for Douglas to cross-examine Loyd on the inculpatory statements. Id. The holding of Douglas in no way limits its application to the invocation the Fifth Amendment.
 {¶ 118} As a result, regardless of Art Bell's presence and testimony at trial, appellant's right to confrontation required Art Bell to be subjected to "full and effective
cross-examination." (Emphasis added.) California v. Green
(1970), 399 U.S. 149, 158. Art Bell's failure to claim the inculpatory prior statements as his own prohibited a full and effective cross-examination on these statements.
 {¶ 119} "[T]he [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined."Crawford v. Washington (2004), 124 S.Ct. 1354, 1370.
 {¶ 120} The procedural guarantees of the Confrontation Clause were clearly violated in the instant case. To hold otherwise, would allow the prosecution to circumvent the ultimate purpose of the Confrontation Clause by reading inculpatory prior statements into evidence for substantive purposes. Further, it would allow the jury to consider evidence, which could only be offered for impeachment purposes, for substantive purposes.
 {¶ 121} This error is of such magnitude that it requires the reversal of appellant's conviction and a new trial. As mentioned previously, Art Bell's prior statements comprised the only direct link between appellant and the murder-for-hire scheme. The record before us demonstrates that the remaining evidence, standing alone, was inconclusive or suspect circumstantial evidence. Therefore, Art Bell's statements clearly formed the core part of the prosecution's case against appellant.
 {¶ 122} The improper introduction of these inculpating statements, standing alone, prevented appellant's confrontation of the witness against him. We cannot ignore this error. Therefore, although appellant failed to bring this error to the attention of the trial court, the improper admission of Art Bell's statements results in plain error. See, e.g., Crim.R. 52(B).
 {¶ 123} More importantly, even assuming that Evid.R. 613(B) applied, and appellant's right to confront the witness had not been violated, Art Bell's statements could only be used for impeachment purposes. As mentioned previously, the court's failure to issue a limiting instruction allowed the jury to consider the inculpatory statements read by the prosecution as substantive evidence of appellant's guilt. The absence of a limiting instruction, standing alone, requires a reversal, as Art Bell's inculpatory statements were the only direct evidence linking appellant to the murder-forhire scheme.
 {¶ 124} Appellant's second assignment of error is with merit. Accordingly, we are required to reverse appellant's conviction and remand this matter for a new trial.
 {¶ 125} Based upon the foregoing analysis, appellant's first, fourth, and fifth assignments of error are without merit. However, appellant's second assignment of error is with merit, thereby rendering his remaining assignments of error moot. Accordingly, we reverse appellant's conviction and remand this matter for further proceedings consistent with our opinion.
Donald R. Ford, P.J., concurs,
Diane V. Grendell, J., concurs in part, dissents in part, with a Concurring/Dissenting Opinion.
[1] Crim.R. 52(B) expressly states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
[2] The testimony of events which Art Bell did remember was cumulative of the testimony of Kendra Bell and Pough. Art Bell's actual testimony merely placed appellant at the Bell's house the day after the murder and established that he gave appellant a substantial amount of money. Art Bell, however, failed to provide direct testimony as to the reason for this payment.
[3] In Wilbon and Marsh, the witnesses of issue were called as the court's witnesses pursuant to Evid.R. 614. Wilbon at ¶ 24; Marsh at 9. In Hartman and Baker, the witnesses of issue were called by the defendants and impeached with prior inconsistent statements by the prosecutors on cross-examination.Hartman at 15; Baker at 651.
[4] The United States Supreme Court has held that a defendant's right to confront witnesses is extended against the states under the Fourteenth Amendment of the United States Constitution.Pointer v. Texas (1965), 380 U.S. 400, 404.