The STATE of Ohio, Appellee,

v.

LEWIS, Appellant.

[Cite as *State v. Lewis* (1991), 75 Ohio App.3d 689.]

Court of Appeals of Ohio,
Ross County.

No. 1676.

Decided Aug. 22, 1991.

*Scott W. Nusbaum,* Assistant County Prosecutor, for appellee.

*Carl P. Hirsch, Jr.,* for appellant.

---

STEPHENSON, Presiding Judge.

This is an appeal from a judgment of conviction and sentence entered by the Common Pleas Court of Ross County, Ohio, upon a jury verdict finding Joseph Lewis, defendant below and appellant herein, guilty of robbery in violation of R.C. 2911.02, an aggravated felony of the second degree. The following errors are assigned:

"Assignment of Error # 1

"Defendant/appellant was prejudiced by the absence of any 18, 19, 20 or 21 year old people in the panel called for jury duty, and further by the lack of even the possibility of having an 18 year old juror on his jury.

"Assignment of Error # 2

"The defendant/appellant was prejudiced when the state was allowed to claim surprise and affirmative damage in order to impeach its own witness with an inconsistent prior statement which had been recanted by the witness but which was incriminating to the defendant/appellant.

"Assignment of Error # 3

"Defendant/appellant was prejudiced when the state was permitted to deviate from the Bill of Particulars to argue a theory of accomplice liability.

"Assignment of Error # 4

"The verdict was against the manifest weight of the evidence in that there was no direct evidence connecting the defendant/appellant with the robbery, and circumstances were such that there could even have been two different instances to which testimony concerning the night in question related."

The following facts pertinent to this appeal appear in the record. At trial, the prosecution adduced evidence tending to establish that on October 28, 1989 Keith Raybourn, age thirty-four, drove to the Butterbeans Lounge located on the premises of the L & K motel in Chillicothe, Ohio. He arrived between 6:00 and 6:30 p.m. and began drinking beer. After consuming six to eight beers, he left the bar at about 10:00 p.m., intending to walk home rather than drive his car because of his consumption of alcohol.

As he was walking through the parking lot, he observed a group of persons standing by the motel pool. Four young black men, around twenty years old, approached him, and one asked for money. He described the person asking for money as slim and with a light voice. Raybourn stated at trial that he told the man that he had spent his money and was headed home. As he walked away, he was jumped from behind and held in a headlock. He lost his glasses and could not identify the person holding him. He was forced across the blacktop to some pine trees where he was kicked and struck a number of times. He was then forced onto his back and his billfold containing approximately $125 was taken by one of the persons attacking him. He suffered a black eye, a lacerated lip, knots on his forehead, and bruises from the beating. He returned to the bar and the police were called. A robbery report was subsequently filed.

One Janeda Lynn Ryder testified at trial that she was sixteen years of age and was a friend of appellant. She testified that on October 28, 1989, she, with some friends, including appellant, went to the L & K Motel because they had heard a party was being given by some girls in an upstairs motel room. Upon arrival, the group discovered that the party had broken up and a number of persons were descending the stairs. Ryder stood in the parking

area talking to three of her friends, including appellant. The witness then testified as follows:

"Q. Standing? Okay. What happened as you were standing there talking?

"A. Uh—well, some guy—I don't know who he was—just came walking and just said something like we didn't have any business of being there and Joey started talking to him and they walked a little further and then just uh—I seen Joey hit the guy and uh—threw him to the ground and that was it. And then by that time uh—my cousin, Chris Mickie had pulled up like there's a—there's a grass area over there and you can't really see the hotel from where the grass area is and I seen him and I just ran over to the car and got in the car with him.

"Q. Okay.

"A. And while we were leaving—as soon as we left—I don't know where everybody came from, but then we seen Charlie's car come up and go out the other parking lot behind—

"* * *

"Q. Now as you were leaving in the car, what did you see?

"A. Charlie—Charlie's car and who ever—and—okay. This is who was in Charlie's car—it was Shawn, Chip, Joey, Charlie and Eric. Yeah, that—that was who was in Charlie's car and they were pulling off right after we did.

"Q. How do you know that they were all in that car?

"A. Because that's who was out there. That's who was all out there with them and I know that—and I know they're all friends and there wasn't—they were just weren't—wasn't going to leave anybody out there.

"Q. Well did you see Joey in—in Charlie Lynch's car?

"A. No, I didn't.

"Q. Okay. So you don't—you don't really know from your own personal observation who was in that car?

"A. No.

"Q. Okay. Where did—where on this person's body did Joe Lewis hit the man?

"A. In the face because his glasses flew.

"Q. Okay. How far were the two from you when Joe Lewis hit the man?

"A. Uh—not very—let's see—approximately uh—I don't know. It wasn't very far. It—I'd say a couple arm distances.

"Q. Do you know where the man was coming from? What direction was he coming from?

"A. He was coming—he was just walking from—it looked like maybe—maybe he would have—it looked like he maybe would have come from across the street because he didn't have any vehicle or anything.

"Q. He didn't have what?

"A. A vehicle. He was walking.

"Q. Okay. Can you describe the man for us other than the fact that he had glasses?

"A. Uh—he's kind of tall. I'm pretty sure he had reddish blondish hair and he had a mustache and that was really all I could tell.

"Q. Okay. Kind of tall. I'm a little bit over six (6) foot. Was he taller or shorter than—than I am?

"A. Uh—I don't know.

"Q. Okay. Was he thinner or heavier than I am?

"A. Thinner.

"Q. Thinner? Most people are.

"(SEVERAL JURORS CHUCKLE IN RESPONSE)

"Q. Was he white or black?

"A. White.

"Q. How did Joe knock him to the ground?

"A. Just—I guess really just by—I don't—I guess you'd call it a slam him—slam him, you know, just not really picking him up and throwing him to the ground, but somewhat like that.

"Q. Okay. Did the man hit Joe that you saw?

"A. No, I didn't see him hit Joey.

"Q. Now when Joe first went toward the man, was the man facing him or was—did he have his back toward him?

"A. He was facing him cause they were—they were talking.

"Q. Would you recognize the—the man that hit the other man and knocked his glasses off if you saw him today?

"A. Yes.

"Q. Is he in the Courtroom today?

"A. Yes.

"Q. Where's he seated Janeda?

"A. Right over there.

"(JANEDA RYDER POINTS TO THE DEFENDANT)"

The state also called as a witness one Paris Thomas, a friend and schoolmate of appellant. The witness had previously given a statement to the authorities that he had been at the L & K Motel on the night of the alleged robbery and that he saw appellant and two others hitting and kicking a man who was between twenty-six and thirty years in age.

Upon being asked on direct examination if he went to a party at the L & K in October 1989, Thomas denied going to the party. The state then requested, over objection, to examine the witness as to the prior statement pursuant to Evid.R. 607 by reason of surprise and affirmative damage to the state's case. A colloquy between counsel and the court followed. Appellant's counsel asserted the police officer handling the case knew prior to trial that the witness would repudiate his prior statement. Counsel for the state stated he was aware of the possibility that the witness might change his testimony but did not know how he would testify. The court below denied a request to take testimony from the officer and then granted the state permission to cross-examine the witness respecting his prior statement. No limiting instruction was requested nor was one given by the court either at that time or in the general instructions. Following the conclusion of the state's case, appellant rested without presenting any evidence. Additional facts will be set forth as pertinent to each assignment of error.

Complaint is made under the first assignment of error that the selection of prospective jury panel violated the fair cross-section of the community requirement in the procedure for selection of juries. We note at the outset that appellant did not file a pretrial motion but instead made an oral motion in chambers, which was unrecorded. Thus, there is no evidence before us as to the procedures used to select jurors in Ross County nor any evidence as to the ages of the prospective jury panel. Accordingly, there is no basis for effective appellate review. For this and additional reasons that follow, the assignment of error is overruled.

The thrust of appellant's argument in his brief is that the jury was chosen solely from voter registration lists prepared pursuant to R.C. 2313.08. It is then argued that since fewer younger persons than older persons register to vote, a list of licensed drivers made pursuant to R.C. 2313.06 should have been used. We disagree.

■ Assuming, *arguendo*, that prospective jurors are chosen solely from voter registration lists, this procedure is constitutionally permissible. The use of voter lists to select qualified jurors has, as stated in *State v. Esparza*

(1988), 39 Ohio St.3d 8, 13, 529 N.E.2d 192, 197, "consistently been upheld by this court." See *State v. Johnson* (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751; *State v. Strodes* (1976), 48 Ohio St.2d 113, 2 O.O.3d 271, 357 N.E.2d 375; *State v. Puente* (1982), 69 Ohio St.2d 136, 23 O.O.3d 178, 431 N.E.2d 987. In *Strodes, supra,* the court specifically observed at 48 Ohio St.2d at 115, 2 O.O.3d at 272, 357 N.E.2d at 377, "The use of voter-registration lists as the source of names of prospective jurors is not unlawful even though it results in the exclusion of nonvoters."

■ In *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587, the United States Supreme Court held that to demonstrate a violation of the fair cross section requirement it must be shown that "(1) the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process."

Simply put, none of these required criteria were established by appellant. The challenge to the array of prospective jurors was properly overruled by the trial court. With respect to whether young adults constitute a distinctive group, the weight of authority, both state and federal, is that they do not. See *Brown v. Harris* (C.A.2, 1981), 666 F.2d 782; *State v. Rupe* (1987), 108 Wash.2d 734, 743 P.2d 210; *Ford v. Commw. of Ky.* (Ky.1984), 665 S.W.2d 304.

■ Argument is made under the second assignment of error that the court erred in allowing the state to impeach its witness, Paris Thomas, by use of a prior statement, upon the basis the state was surprised by Thomas's testimony which resulted in affirmative damage to the state's cases.

Evid.R. 607 reads as follows:

"The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Rules 801(D)(1)(a), 801(D)(2), or 803."

The above rules abolish, in part, the "voucher rule," which prohibited a party from directly attacking the credibility of its own witness. However, it was permissible when the state was surprised by testimony of a witness it had called to "interrogate such witness concerning his prior inconsistent * * * statement * * * for the purpose of refreshing the recollection of the witness, but *not for the purpose of offering substantive evidence against the ac-*

*cused."* (Emphasis added.) *State v. Duffy* (1938), 134 Ohio St. 16, 17, 11 O.O. 383, 383, 15 N.E.2d 535, 535. See *Hurley v. State* (1888), 46 Ohio St. 320, 322, 21 N.E. 645, 646; *State v. Minneker* (1971), 27 Ohio St.2d 155, 56 O.O.2d 97, 271 N.E.2d 821.

The purpose of the surprise and affirmative damage limitations is explained in Giannelli, Ohio Evidence Manual (1988) 29, Section 607.03(a), as follows:

"Unlike Federal Rule 607, the Ohio rule imposes a limitation on the impeachment of a party's own witness by means of a prior inconsistent statement. In such a case, impeachment is permitted only upon a showing of surprise and affirmative damage. This limitation was intended to prevent the circumvention of the hearsay rule. Except as provided in Rule 801(D)(1)(a), prior inconsistent statements constitute hearsay evidence, and thus are admissible only for the purpose of impeachment. *See* Author's Comment § 613.01. Without the surprise and affirmative damage requirements, a party could call a witness for the sole purpose of disclosing the prior inconsistent statement (hearsay) to the jury. An instruction limiting the use of the statement to impeachment would likely be ineffective. *See* Staff Note ('Otherwise, the party would be entitled to call a known adverse witness simply for the purpose of getting a prior inconsistent statement into evidence by way of impeachment, thus doing indirectly what he could not have done directly.')."

Appellant contends both rule limitations applied and, in effect, the impeachment of Thomas was done by the prosecution in order to place the prior statements before the jury in violation of the hearsay rule.

Whether a party is taken by surprise by a witness it has called "is a decision that is entrusted to the broad, sound discretion of the trial judge." *State v. Diehl* (1981), 67 Ohio St.2d 389, 391, 21 O.O.3d 244, 246, 423 N.E.2d 1112, 1114. From the colloquy between the court and counsel, while there was a possibility of a change of story, it does not appear the witness expressly notified the authorities that he would wholly deny his prior statement to the police officers. Accordingly, we find no abuse of discretion in that regard.

A showing of "affirmative damage" is also required to impeach under the rule. After the state offered to place on the stand the police officer who talked to the witness by telephone the weekend before trial, the following occurred:

"THE COURT: I don't think it's necessary. I had—it seems to me that—that the State has shown affirmative damage when he back tracked—

"MR. HIRSCH: Well I—I agree, but surprise I don't think is—

"THE COURT: Well it seems to me that he's surprised I mean I don't think that he expected this kind of back tracking."

It would appear that the court, as well as defense counsel, concluded that backtracking by the witness on a prior statement implicating appellant, by the witness's denial of being present at the alleged robbery, constituted affirmative damage as that term is used in the rule. In *State v. Stearns* (1982), 7 Ohio App.3d 11, 15, 7 OBR 12, 17, 454 N.E.2d 139, 144 the court stated as follows:

"The second requirement for use of a prior statement to impeach one's own witness is a showing of affirmative damage. This is a new concept to Ohio law. There are no federal cases which would assist Ohio courts in applying that restriction, since Fed.R.Evid. 607 permits use of a prior inconsistent statement to impeach one's own witness, without limitations. It is a restriction applied by some other jurisdictions. See McCormick, Law of Evidence (2 Ed. Cleary Ed. 1972), at 76–77. Both the surprise and affirmative damage restrictions are apparently imposed to prevent counsel from circumventing the hearsay bar against communicating prior statements to the jury under the guise of impeachment. Without these limitations most prior statements could be read to the jury by calling their authors to testify.

" 'Affirmative damage' is explained in the Staff Note accompanying Evid.R. 607:

" ·'Requiring a showing of affirmative damage is intended to eliminate an "I don't remember" answer or a neutral answer by the witness as a basis for impeachment by a prior inconsistent statement.'

"The party's own witness must testify to facts that contradict, deny, or harm that party's trial position before the calling party can use the witness' prior inconsistent statement to impeach. *Cf. Mitchell v. Swift & Co.* (C.A.5, 1945), 151 F.2d 770."

Thus, the denial by the witness of his presence at the time of alleged robbery did not cause affirmative damage because such testimony did not contradict, deny, or harm the state's case. Accordingly, the court below erred in allowing cross-examination by the state and the disclosure of the contents of the prior statement. Further, it was not invited error because the court ruled prior to the agreement by defense counsel. In short, counsel did not induce or invite the error.

■ We are not persuaded that this error can be considered harmless under Crim.R. 52(A). The only direct testimony linking appellant to the robbery was Janeda Lynn, who testified she saw appellant strike an unidentified man but did not see anything further. Further, her testimony conflicted in part with that of the victim as to how he was struck. The prior incriminating hearsay statement of Thomas was important to the state's case because it tended to

confirm that appellant and two friends attacked the victim and corroborated the victim's testimony.

Further error occurred since under no circumstances could the prior statement be used as substantive evidence that could properly be considered by the jury. Appellant was entitled to an instruction that the prior statement of Thomas was not to be considered as substantive evidence but no such request was made and the court gave no such instruction. It is apparent that the jury may have considered the prior statement as substantive evidence in this case in light of the state's closing argument, wherein it made the following statement:

"Paris wants you to believe that he just heard this on the street and that's what he intended to communicate in this statement. Well, we went over this before and that's not what he said. The germane part of this statement is that he saw three people, Charles Lynch, he identified him in this statement and admitted to it on the Stand; Eric Young, he admitted that he saw—that he stated that in this—on the Stand, and Joe Lewis—not only hit him, but kicking a man that was down. *Now we argue that this statement that he gave and admitted to giving on the Stand, is what you should believe—not his testimony that he was not there and this was all just hearsay.*" (Emphasis added.)

We conclude, therefore, that the prior statement was not admissible because the state failed to show that it was affirmatively damaged by Thomas's testimony. Further, once the court allowed the prior statement to be admitted, it further erred in failing to give a limiting instruction. Accordingly, appellant's second assignment of error is sustained.

■ The indictment read, *inter alia,* as follows:

"That Joseph Lewis, on or about the 28th day of October, 1989, at the County of Ross aforesaid did, in attempting or committing a theft offense as defined in Section 2913.01 of the Ohio Revised Code, or in fleeing immediately after such attempt or offense, use or threaten the immediate use of force against another, in violation of Section 2911.02 of the Ohio Revised Code and against the peace and dignity of the State of Ohio."

A bill of particulars was filed by the state reading, *inter alia,* as follows:

"The State of Ohio will prove on the trial of the above stated case the following matters:

"That Joseph Lewis, on or about the 28th day of October, 1989, between the hours of 9:00 and 11:00 P.M., in the area of the L & K Motel, 1135 East Main Street, Chillicothe, Ross County, Ohio, did, in attempting or committing a theft offense as defined in Section 2913.01 of the Ohio Revised Code, or in fleeing

immediately after such attempt or offense, use or threaten the use of force against another, to wit: Keith D. Rayburn [sic]. Said alleged activity being in violation of Section 2911.02(A) of the Ohio Revised Code."

During closing argument, the state argued the following:

"Mr. Hirsch wants you to think that if we don't prove that Joe Lewis was the one that actually took the wallet out of his pocket, then we haven't proved the case. Well that's simply not true. A person that goes and kicks a man in the face while his companion takes the wallet out of the victim's pocket, certainly is just as guilty as the man taking the wallet out of the pocket.

"OBJECTION, MR. HIRSCH: I'm going to object and ask if we can approach the Bench?

"THE COURT: Overruled.

"MR. HIRSCH: It's contrary to the Bill of Particulars.

"THE COURT: Overruled. This is Argument.

"MR. HIRSCH: Okay."

Appellant contends the court should have sustained the objection and appellant was prejudiced by the ruling. We agree the court erred. There is nothing in either the indictment or bill of particulars suggesting appellant was guilty as an aider or abetter. The state had not tried the case upon a theory that appellant was guilty as an aider or abetter, had not requested pursuant to Crim.R. 30(A) an aider or abetter instruction, although arguably it could have done so since an aider and abetter may be indicted as a principal under R.C. 2923.03, and, in fact, no such instruction was given by the court.

Accordingly, the court should have sustained the objection and advised the jury that it must follow the law as given by the court. The court later instructed the jury that "[i]t is your sworn duty to accept these instructions and to apply the law given to you by this court." We conclude the error was not prejudicial, however, since, under the instructions, appellant could be found guilty *only* if the state proved that appellant committed the offense as a principle offender. Therefore, the third assignment of error is overruled.

■ Under the fourth assignment of error, appellant urges the evidence was insufficient to convict him beyond a reasonable doubt and, therefore, his conviction was against the manifest weight of the evidence. The elements of the offense of robbery as proscribed by R.C. 2911.02 are the following:

(1) In attempting or committing a theft offense as defined in R.C. 2913.01

(2) use or threaten immediate use of force

(3) against another.

Testimony of Keith Raybourn established that a theft offense was committed, *i.e.*, his wallet was forcibly removed by some person or persons and force was used against him to accomplish such theft. Since the victim could not identify who robbed him, the ultimate issue of fact was whether the circumstantial evidence was sufficient to establish by inference that appellant was the person who attacked him and participated in the removal of the wallet.

Appellant urges that if the evidence is sufficient to allow the inference that he was the person attacking the victim, a further inference that he stole the wallet, resting solely upon the first inference, was prohibited. We conclude that the facts support the inference that appellant was the person who attacked Raybourn at the time and place the robbery occurred. The testimony of Janeda Lynn Ryder identified appellant as the one who struck a person at the approximate time and place of the robbery. She described the person struck as walking by, kind of tall, with reddish blonde hair, a mustache and wearing glasses. The jury observed the victim when he testified and was in position to observe whether his physical characteristics were as described by Ryder.

Appellant urges that the testimony of Rhonda Alexander, who was employed at the motel, but not working at the time of the robbery, tends to establish the possibility that a second fight occurred. However, we find this argument unpersuasive in that her testimony is essentially consistent with that of the robbery victim and there is no other evidence of any separate altercation.

Additionally, in light of the above stated facts and the testimony of Ryder that appellant was the person talking to the person struck, coupled with the testimony of the victim that only one person demanded money from him, it is a reasonable inference that, upon the victim's refusal, appellant attacked the victim and removed or participated with others in stealing the wallet. This inference is based not only upon the first inference but in part upon the additional facts and is a permissible parallel inference. *McDougall v. Glenn Cartage Co.* (1959), 169 Ohio St. 522, 9 O.O.2d 12, 160 N.E.2d 266.

In *State v. Graven* (1978) 54 Ohio St.2d 114, 118–119, 8 O.O.3d 113, 116, 374 N.E.2d 1370, 1373–1374 the following is stated:

"Therefore, it is axiomatic that criminal conduct may be and, in many instances, can only be proved by circumstantial evidence. However, the circumstantial evidence relied upon to prove an essential element of the crime must be irreconcilable with any *reasonable* theory of the accused's innocence in order to support a finding of guilty. *State v. Kulig*, 37 Ohio St.2d 157, 66 O.O.2d 351 [309 N.E.2d 897] (1974).

"Thus, where circumstantial evidence is relied upon to prove elements of the crime, as in the cause *sub judice*, the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocence. This determination of the reasonableness of a hypothesis as a jury prerogative was recognized by the Supreme Court of the United States in *Holland v. United States*, 348 U.S. 121 [75 S.Ct. 127, 99 L.Ed. 150] (1954), wherein the court stated, at page 140 [75 S.Ct. at 137–138]:

" 'Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilty against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. * * * '

"Similarly, language in *State v. Sheppard, supra* [1956] (165 Ohio St. 293, 59 O.O. 398 [135 N.E.2d 340]), likewise implies that the determination of reasonableness includes a determination of whether the hypothesis is reasonable in view of the weight and credibility that the jury gives to the evidence. (See *State v. Williams*, 47 Ohio App.2d 330, 336, 1 O.O.3d 393, 396 [354 N.E.2d 691, 695] [1976].) In paragraph six of the syllabus in *State v. Sheppard, supra*, this court stated:

" 'Where circumstantial evidence alone is relied upon in the proof of any element of a crime, and the jury finds that there is a reasonable hypothesis of innocence, after considering all the evidence, it is its duty to acquit; however, where the *jury finds*, after full deliberation, that there is no reasonable *hypothesis of innocence based on the facts as it finds them to be*, and the facts which it finds are irreconcilable with any reasonable hypothesis other than guilt, it is its duty to convict.' (Emphasis added.)"

"Thus, once the jury has reached its decision, an appellate court, in a case where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence." [1]

We are not persuaded that under the evidence the jury was required to find a reasonable hypothesis of innocence existed so that a reversal is required. Appellant's argument suggests a possible hypothesis of innocence rather than a reasonable hypothesis of innocence. That is not enough. *State v. Ebright* (1983), 11 Ohio App.3d 97, 11 OBR 150, 463 N.E.2d 400.

---

1. After preparation of this opinion, the Ohio Supreme Court in *State v. Jenks* (1991) 61 Ohio St.3d 259, 574 N.E.2d 492 overruled *State v. Kulig,* referred to in *Graven.*

We hold that there was substantial evidence of probative value which if believed would convince the average mind beyond a reasonable doubt of appellant's guilt. Accordingly, the fourth assignment of error is overruled.

Having sustained the second assignment of error the judgment is reversed and the cause remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

GREY and HARSHA, JJ., concur.