[Cite as *State v. Williams*, 2016-Ohio-5827.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-150249 |
| | | TRIAL NO. B-1303549 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| WILLIAM WILLIAMS, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Sentence Vacated in Part, and
    Cause Remanded

Date of Judgment Entry on Appeal: September 16, 2016

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffman*, Assistant Public Defender, for Defendant-Appellant.

**STAUTBERG, Judge.**

{¶1} Defendant-appellant William Williams, Jr., appeals from his convictions for two counts of aggravated murder with firearm specifications, one count of aggravated robbery with a firearm specification, and one count of having a weapon while under a disability. We affirm Williams's convictions, but remand this cause for resentencing.

**A Double Shooting**

{¶2} Shortly after 1 a.m. on April 13, 2013, Cincinnati police officers responded to reports of gunfire in the area of the Winton Terrace apartment complex. A few minutes later, police received another call reporting that two people appeared to have been shot in a car in the Winton Terrace parking lot. When police arrived at the scene, they discovered victims John Martin and Brandi Fields, dead, in Martin's Jaguar sedan. The front driver's side door was open. Martin, who was in the driver's seat, had been shot once in the back of his head. One of the pockets in his pants had been turned inside out, and he had no personal items on him. Fields was in the front passenger seat. Her body was facing Martin and leaning against the passenger-side door, with her feet up on the passenger's seat. She, too, had been shot. Her personal effects were largely undisturbed. Neither victim had a cell phone on them.

{¶3} Police collected evidence from inside of the car, including a gin bottle and cigarette butts. A cigarette butt was also discovered outside of the car, as was what appeared to be "fresh spit." The saliva was found on the pavement outside of the front driver's side door. It was collected as evidence.

{¶4} Later ballistic testing revealed that the bullets found in each victim had been fired from the same gun. The saliva collected at the scene matched Williams's

DNA profile, as did DNA lifted from cigarette butts found inside and outside of the car. Williams's DNA and fingerprints were found on the bottle of gin recovered from the back seat of Martin's car.

{¶5} Forensic pathologist Karen Looman, M.D., examined Martin's and Field's bodies. According to Dr. Looman, Martin was killed by a single gunshot wound to the back right side of his head. The location of his wound and the path that the bullet had traveled was consistent with somebody in the rear passenger seat shooting him. Dr. Looman testified that Fields, who had been facing Martin when she was shot, had gunshot wounds in her right arm and left hand, and that these wounds were consistent with Fields having thrown her arms up into a defensive position. Fields was also shot above her right eyebrow, and at the tip of her nose. The gunshot wounds to her face were fatal. The location of Fields's wounds was consistent with someone firing a gun from outside of the driver's side door. Dr. Looman believed that Fields and Martin had been shot where they were found.

**Williams's Statements to the Police and his Phone Calls to Bazel**

{¶6} Even before the evidence at the scene had been processed, police developed Williams as a suspect in the shooting deaths of Martin and Fields based on the tracking of Martin's cell phone. Within days after the shootings, police discovered that on April 13, 2013, at 11:33 p.m., a SIM card had been put in and then quickly taken out of a cell phone that had belonged to Martin. The SIM card belonged to a cell phone registered in Skye Bazel's name. Bazel was Williams's fiancée. On April 16, 2013, police tracked the cell phone containing the SIM card in Bazel's name to a house where Williams and Bazel were staying, and they took Williams in for questioning.

{¶7}    Williams told police that he had purchased Martin's cell phone for $50 from an individual named Greg Summerland who was also known as "Joker." Williams gave police several stories concerning when he purchased the phone, before finally settling on "probably before noon" on April 13, 2013.

{¶8}    Police also questioned Williams in connection with the shootings. Williams admitted that he was with Martin in the hours before Martin and Fields were killed, but claimed that Fields was never in the car with them. He said that he and Martin had driven around that day in Martin's Jaguar and had "got a bottle, drunk, chilled, whatever." He said that he had been in both the front and the back seats of the Jaguar. Around 11 p.m. on April 12, 2013, Williams, who did not have his own cell phone, used Martin's cell phone to call Bazel. Williams told police that after he had spoken with Bazel at 11 p.m., Martin had driven him to meet Bazel at the Winton Terrace apartments, where Bazel lived. According to Williams, after he met with Bazel he did not return to Martin's car and did not see Martin again that night. Williams claimed that he tried to return home after speaking with Bazel, but that his father would not let him in, so he picked up Bazel and went to his cousin Catherine Williams's house. He did not know what time they arrived.

{¶9}    After giving his statement to police, Williams was held in the Justice Center on a receiving stolen property charge. While he was there, he made several phone calls to Bazel. These telephone calls were recorded, and they were played at trial. In the calls, Williams discussed with Bazel the story that he had told the police about how he had acquired Martin's cell phone. He often ended his sentences with "you feel me?" In one call, Williams said to Bazel, "Yeah, I told them * * * that I bought the phone off * * * Joker and that I gave it to you. You feel me?" After one such statement, Bazel answered "that's good." At several points in these

4

conversations, Bazel became angry over the fact that a woman had been killed. During one of her outbursts, she stated "Oh no, you know you have to deal with it."

{¶10} Police interviewed Williams again on May 9, 2013, this time at Williams's request. Williams again claimed that after he had met with Bazel around 11 p.m. on April 12, 2103, he never returned to Martin's car. Williams pointed out on a diagram the place where Martin had parked his car when he had dropped Williams off. The parking spot was the same parking spot where Martin's car was found following the shootings. Williams surmised that after Martin left him, he had picked up Fields and later returned to the same parking spot.

## The State Offers Evidence that Contradicts Williams's Statements

{¶11} The state presented evidence at trial that Williams was with both Martin and Fields on the night of the shootings, and not just with Martin, as Williams had claimed. Lisa Jones, Fields's mother, testified at trial that she and Fields were at home together on the evening of April 12, 2013. Jones knew Martin well because he and Fields had a child together. Jones watched from her window as Fields left for the night around 9:30 p.m. She saw Martin in the front seat of his Jaguar. As Fields approached the car, Jones saw a man "with wild hair" get out of the front seat and get into the back seat of Martin's car. Jones later identified Williams as the man "with wild hair" after she saw a story on the news about the shootings.

{¶12} In further support of the state's theory that Williams had been with Martin and Fields most of the evening, the state submitted cell phone text message records into evidence at trial. According to these records, a text message, "bay," was sent from Martin's cell phone to Field's cell phone at 12:52 a.m. on April 13, 2013. The response was "Yes, hun." And the reply to that was "Love you." The state argued

that these text messages suggested that someone else was with Martin and Fields, and that they were texting these messages to keep them private. Just minutes after the texts were sent, the call came into police reporting that gunshots had been fired in the area of the Winton Terrance apartments. The next activity on Martin's phone came at 11:33 p.m. on April 13, 2013, when Bazel's SIM card was inserted into Martin's cell phone.

**Bazel's Story**

{¶13} At trial, Bazel testified that, a little after 11 p.m. on April 12, 2013, she met Williams at the top of her street in the Winton Terrace apartment complex. According to Bazel, Martin had driven Williams to meet her, she and Williams had talked, and then had gone their separate ways. Bazel thought that Williams was going back to Martin's car, but did not know for certain whether he had. Williams called Bazel a few hours later, and asked her to meet him at Catherine Williams's house. Bazel testified that she did not drive with Williams, but that she met him there sometime between 4 a.m. and 6 a.m. on April 13, 2013.

{¶14} On the afternoon of April 13, 2103, Bazel and Williams went shopping, together. Williams spent hundreds of dollars on numerous items, including a $389 engagement ring for Bazel. Photographs of the smiling couple with shopping bags were taken on a cell phone that police later discovered had belonged to Martin.

**Two State's Witnesses Change their Stories**

{¶15} Catherine Williams was called as a state's witness. When she had spoken with police following the shooting, she had told them that Williams had arrived at her house between 12:30 a.m. and 2 a.m. on April 13, 2013. At trial, Catherine Williams testified that Williams had arrived at her house between 11:30 p.m. on April 12 and 12:15 a.m. on April 13. Over defense counsel's objection, the

state impeached Catherine Williams's credibility with her prior inconsistent statement to the police concerning the time that Williams had allegedly arrived at her place.

{¶16} State's witness Andre Wilson also did not testify as the state had expected. Wilson had been in jail with Williams while Williams was awaiting trial. Prior to trial, Wilson had spoken with police detectives concerning a conversation he had allegedly overheard in jail between Williams and another inmate. Wilson told the detectives that Williams had said something along the lines of "it had to be done like that," or "we had to do him like that." Wilson believed that Williams had been referring to the Martin and Fields shootings because, in the same conversation, Williams had said that the shootings had occurred in a Jaguar.

{¶17} When Wilson took the stand at trial, he stated that he had never met with police, had no idea who Williams was, and had no idea why he had been called to testify. Wilson purportedly invoked his Fifth Amendment Right against self-incrimination, and refused to answer further questions.

{¶18} After Wilson refused to testify further, the state called one of the detectives that Wilson had spoken with to the stand. The state asked the detective if he had met with Wilson, and whether Wilson had given a statement. The detective answered "yes" to both questions. The state then attempted to ask the detective questions about the substance of Wilson's statement. Defense counsel objected. The trial court took the objection under submission.

**A Substitute Judge is Designated**

{¶19} Before ruling on the objection, and roughly a week into trial, the trial judge became ill and was unable to continue to preside over the case. A new judge was designated, and the case was continued so that that judge could familiarize

himself with the case. Defense counsel objected to the substitution, and asked for a new trial. The newly designated judge certified on the record that he had familiarized himself with the case, felt that he could preside over the remainder of the case, and overruled Williams's objection to the substitution. The newly designated judge also overruled Williams's objection concerning whether Wilson could be impeached with his prior statement, and the court allowed Wilson's entire statement to be played for the jury. The jury was instructed before Wilson's statement was played that it was to be considered for impeachment purposes, only.

{¶20} At the close of the state's case and after the defense had rested, Williams moved the trial court for an acquittal as to all charges pursuant to Crim.R. 29(A). Both motions were overruled, and the case was sent to the jury for deliberation.

**The Jury's Verdict and the Court's Sentence**

{¶21} Following deliberations, the jury found Williams guilty of the aggravated murders of Martin and Fields, each with a firearm specification, the aggravated robbery of Martin with a firearm specification, and one count of having a weapon while under a disability ("WUD"). In open court, the trial court sentenced Williams on count one of his indictment, aggravated murder, to "a mandatory sentence of life * * * without parole for thirty years in this instance." The court ordered a three-year sentence on the gun specification to count one. On count two, aggravated murder, the court sentenced Williams to "life without parole for thirty years." The court sentenced Williams to eight years' imprisonment on count three, aggravated robbery, and to three years on count five, WUD. During Williams's sentencing hearing, the trial court did not impose any sentence on the gun specifications to counts two and three.

8

{¶22} The court later journalized a sentencing order. There were discrepancies between the court's pronouncement of sentence and its judgment entry imposing sentence.

{¶23} This appeal followed.

## State's Impeachment of Andre Wilson

{¶24} In his first assignment of error, Williams contends that the trial court erred when it allowed the state to impeach Andre Wilson's credibility by playing for the jury the entire statement that Wilson had made to the police detective.

{¶25} We will not reverse a case based on a trial court's decision to admit or exclude evidence absent an abuse of discretion in the admission of the evidence, and a showing that the accused has suffered material prejudice as a result. *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985); *see State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. An abuse of discretion connotes that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218, 450 N.E.2d 1140 (1983).

{¶26} When a party seeks to impeach its own witness through use of a prior inconsistent statement, the party calling the witness must first show surprise and affirmative damage by the witness's testimony. Evid.R. 607(A); *State v. Hancock*, 1st Dist. Hamilton No. C-030459, 2004-Ohio-1492, ¶ 36. Provided both of these requirements have been met, pursuant to Evid.R. 613(B), the witness must be given the opportunity to explain or deny the statement, and the opposing party must be given an opportunity to question the witness concerning the inconsistent statement. Evid.R. 613(B). If all of these requirements have been met, the examining party may,

at that party's discretion, call another witness to impeach the recanting witness through the prior statement, provided the witness is competent to do so.

{¶27} In this case, Williams argues that the state should not have been allowed to impeach Wilson by calling the detective to the stand to testify about Wilson's prior statement, because the state failed to first demonstrate "affirmative damage" under Evid.R. 607(A). Williams is correct.

### Affirmative Damage not Shown by Neutral Answers

{¶28} "Affirmative damage" under Evid.R. 607(A) occurs when a party's own witness testifies to facts that contradict, deny, or harm that party's trial position. *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 27, citing *Hancock* at ¶ 37, and *State v. Seay*, 1st Dist. Hamilton No. C-040763, 2005-Ohio-5964, ¶ 43; *see State v. Asher*, 112 Ohio App.3d 646, 679 N.E.2d 1147 (1st Dist.1996). The staff note to Evid.R. 607 provides that "Requiring a showing of affirmative damage is intended to eliminate an 'I don't remember' answer or a neutral answer by the witness as a basis for impeachment by a prior inconsistent statement." And the Ohio Supreme Court has held that the answer "I couldn't really tell" constituted a neutral statement because, in the context of the questioning at hand, the answer did not contradict any fact in the witness's prior statement. *State v. Keenan*, 66 Ohio St.3d 402, 412, 613 N.E.2d 203 (1993); *see State v. Armstrong*, 11th Dist. Trumbell Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, ¶ 103-104 (a nonharmful neutral answer, such as "I don't know" or "I can't remember" did not show affirmative damage, as such answers failed to contradict a prior statement); *State v. Martin*, 8th Dist. Cuyahoga No. 73842, 1999 Ohio App. LEXIS 1830, *12 (April 22, 1999) (an answer "I don't remember" did not cause affirmative damage to the prosecution's case); *State v. Lewis*, 75 Ohio App.3d 689, 696-697, 600 N.E.2d 764

(4th Dist.1991) (denial of presence at a robbery scene considered a neutral answer where witness was not contradicting facts relevant to the crime at issue).

{¶29} When Wilson took the stand, he stated that he had never met with police, had no idea who Williams was, and that he had no idea why he had been called by the state to testify. After making several more statements to a similar effect, Wilson refused to answer any other questions and purported to invoke his Fifth Amendment right against self-incrimination.

{¶30} The state contends that Wilson's trial testimony harmed the state's position, because without it the state could not present direct evidence of Williams's knowledge of details of the murders. This argument has no merit. The fact that a witness does not testify as expected does not, in and of itself, constitute "affirmative damage" as contemplated by Evid.R. 607. If this were the case, the "surprise" requirement of Evid.R. 607(A) would suffice to lay the first step of the necessary foundation for impeachment of one's own witness with a prior inconsistent statement.

{¶31} The state next argues that it demonstrated "affirmative damage" because Wilson's testimony could have led the jury to believe that the state was fabricating evidence against Williams. There were several comments from Wilson that the state presumably relies on in support of this argument. The first was Wilson's statement at the beginning of questioning that "[t]hey called me back from Blackburn [prison] and told me something that I was—I had to testify against somebody. I do not know this man. In no kind of way have we had any kind of dealings do [sic] I know him at all." After repeated questioning from the state, and after Wilson consistently denied having any knowledge about the case, Wilson

11

stated, "But I'm not going to sit here and say something that you want me to admit up to that I don't know nothing about. I'm not going to do that."

{¶32} Assuming only for the sake of argument that these comments caused some harm to the state's case, this harm does not constitute "affirmative damage" as that term is used in Evid.R. 607(A). Wilson did not testify to any *facts* that contradicted, denied, or harmed the state's position that Williams was guilty of the crimes charged. Instead, the bulk of Wilson's testimony was that he knew nothing about the case. Wilson gave answers such as "I don't recall speaking to no [sic] Detective * * *," and "I don't know that man [Williams] or know nothing about what I'm sitting down here for," and "I don't know nothing [sic] about this case or nothing [sic]." The trial court therefore erred by finding "affirmative damage" in this case.

{¶33} Because the "affirmative damage" requirement of Evid.R. 607(A) was not met, the trial court abused its discretion when it allowed the state to impeach Wilson by calling the detective to the stand and playing Wilson's entire taped statement for the jury.

### Williams was not Materially Prejudiced

{¶34} We must next determine whether Williams was materially prejudiced by the admission of Wilson's prior statement, warranting a reversal on appeal.

{¶35} Williams contends that he was prejudiced and that this case should be reversed because Wilson's statement constituted inadmissible hearsay that could not be cured by the court's limiting instruction. Williams cites *State v. Huff*, 1st Dist. Hamilton No. C-930861, 1995 Ohio App. LEXIS 294 (Jan.31, 1995), in support of this argument. In *Huff*, the trial court allowed the state to impeach its own witness with a prior inconsistent statement without the requisite showing of surprise and affirmative damage. Before the prior statement was played, the trial court refused—

12

over defense counsel's objection—to give the jury a limiting instruction concerning the nature of impeachment evidence. Instead, the court allowed the state to present the statement as if it were being offered for its truth. A day later, after the defense moved for a mistrial, the court gave the jury a curative instruction, explaining that the statement could only be used for impeachment purposes. During deliberations, the jury asked the court to clarify what "impeachment" meant. Based on these factors, we held that the limiting instruction was of no effect. *See Huff.*

{¶36} The present case is distinguishable. Most significantly, here the state never purported to present Wilson's statement for its truth. And the jury was instructed before Wilson's statement was played that it was to be considered for impeachment purposes, only. Further, there was no indication that the jury was confused by the court's instruction. It is well-settled that a jury is presumed to follow the court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994). We find no indication to the contrary. Consequently, we find that *Huff* does not apply in this case.

{¶37} Williams next contends that playing Wilson's statement is grounds for a reversal because it violated his right to confront his accusers as guaranteed by the Sixth Amendment to the United States Constitution. This argument is premised on Williams's position that Wilson's prior statement was hearsay. *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We have already determined that it was not. This argument therefore has no merit.

{¶38} Williams's first assignment of error is overruled

## State's Impeachment of Catherine Williams

{¶39} We next address, out of order, Williams's fifth assignment of error. In it, he argues that the trial court erred when it allowed the state to impeach its own

13

witness, Catherine Williams, with her prior statement to police, because the state failed to first demonstrate "surprise" under Evid.R. 607(A).

{¶40} Surprise can be shown where a witness's testimony is materially inconsistent with a prior written or oral statement and counsel did not have reason to believe that the witness would recant when called to testify. *State v. Holmes*, 30 Ohio St.3d 20, 23, 506 N.E.2d 204 (1987); *Hancock*, 1st Dist. Hamilton No. C-030459, 2004-Ohio-1492, at ¶ 37. "The determination of surprise is left to the sound discretion of the trial court." *Hancock* at ¶ 37, citing *State v. Diehl*, 67 Ohio St.2d 389, 423 N.E.2d 1112 (1981).

{¶41} In this case, Catherine Williams had been interviewed by police during their investigation into Martin's and Field's deaths. At that time, she stated that Williams had arrived at her home between 12:30 a.m. and 2 a.m. on Saturday April 13. At trial, Catherine Williams testified that Williams arrived at her house between 11:30 p.m. on April 12 and 12:15 a.m. on April 13. The timing of Williams's arrival was important to the state's case because the state was attempting to place Williams at the murder scene at approximately 1 a.m. on April 13—the time that gunshots had been reported in the area. When Catherine Williams did not testify consistently with her statement to the police, the state indicated to the court that it "was expecting her to give her statement in accordance with the statement that she had previously given."

{¶42} Williams claims that because Catherine Williams was the defendant's cousin, the state should have automatically anticipated that she would change her story, and that the state therefore was not "surprised." Williams cites no case law to support this argument. And we find none. Here, the state met its burden of demonstrating "surprise" by informing the court that it had expected Catherine

14

Williams to testify in accordance with her prior statement concerning the time of Williams's arrival at her home. There is nothing in the record to indicate that the state should have anticipated that Catherine Williams would change her story. The trial court therefore did not abuse its discretion in determining that the state had demonstrated "surprise" under Evid.R. 607(A). Williams's fifth assignment of error is overruled.

**Designation of a Substitute Trial Judge**

{¶43} In his second assignment of error, Williams argues that his Fifth, Sixth and Fourteenth Amendment rights to due process of law and to a jury trial were violated when, after a different judge was designated to preside over his trial, the trial court failed to grant him a new trial under Crim.R. 25(A).

{¶44} Under Crim.R. 25(A), when the judge presiding over a jury trial is unable to proceed, a new trial judge may be designated. The new judge may preside over the remainder of the trial provided he certifies that he has sufficiently familiarized himself with the record of the trial. Crim.R. 25(A). Where the newly designated judge cannot adequately familiarize himself with the record, that judge has the discretion to grant a new trial. *Id.*

{¶45} In this case, the original trial judge became ill after five days of trial and was unable to continuing presiding over Williams's trial. The newly designated judge indicated on the record that he had read the trial transcript, reviewed the evidence, and felt that he had complied with the requirements of Crim.R. 25(A). Williams objected to the substitution. He moved for a new trial on due process grounds. More specifically, Williams argued that the newly designated judge would be unable to properly rule on a Crim.R. 29 motion because he would be unable to assess the credibility of the witnesses. His motion was denied.

15

{¶46} Williams now claims that his Sixth Amendment right to a jury trial was violated when the same judge did not preside over his entire jury trial. He also claims that his Fifth Amendment right to due process of law was violated because the substitute judge was unable to make credibility determinations when (1) ruling on Williams's Crim.R. 29 motions, (2) ruling on Williams's objection to the admissibility of Wilson's prior inconsistent statement, and (3) when sentencing Williams.

### No Sixth Amendment Violation

{¶47} We first address Williams's contention that the substitution violated his right to a jury trial. Since Williams did not raise this objection in the trial court, he has forfeited all but plain error on appeal. *See* Crim.R. 52(B); *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23; *State v. Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 39.

{¶48} Williams claims that the Sixth Amendment right to a jury trial as applied to the states through the Fourteenth Amendment encompasses a defendant's right to have the same trial judge preside over the entire trial. He cites *Freeman v. United States*, 227 F. 732 (2d Cir.1915) in support of this argument. In that case, over 100 years ago, the Second Circuit held that "in a criminal case, trial by jury means trial by a tribunal consisting of at least one judge and twelve jurors, all of whom must remain identical from the beginning [of the trial] to the end." *Id.* at 759. But the Second Circuit later repudiated this holding as being based on the faulty premise that a defendant could not waive his right to a jury trial. *United State v. La Sorsa*, 480 F.2d 522, 531 (2d Cir.1973), citing *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). Further, neither the plain text of the Sixth Amendment, nor any controlling case law provides that a criminal defendant has the

right to the same trial judge throughout trial. Because Williams has failed to demonstrate error, let alone plain error, we hold that this argument has no merit.

**No Fifth Amendment Violation**

{¶49} Williams next claims that his Fifth Amendment right to due process of law was violated when the substitute judge (1) ruled on his Crim.R. 29(A) motions, (2) ruled on his objection to the admissibility of Wilson's prior inconsistent statement, and (3) sentenced Williams.

{¶50} The Fifth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the state from depriving any person "of life, liberty, or property, without due process of law." *See State v. Williams*, 6 Ohio St.3d 281, 286, 452 N.E.2d 1323 (1983). We first address Williams's argument that his right to a fair trial was violated when the substitute judge ruled on Williams's Crim.R. 29(A) motions for an acquittal.

{¶51} In pertinent part, Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Williams claims that because the substitute judge was unable to assess the demeanor of all of the state's witnesses and make credibility determinations, he could not properly rule on Williams's Crim.R. 29(A) motions that were made at the close of the state's case, and also after the defense had rested. Williams is incorrect. A Crim.R. 29(A) motion tests the sufficiency of the state's case. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 78 N.E.2d 541 (1997); *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. A sufficiency inquiry presents a question of law. *Thompkins* at 386. It does not involve

credibility determinations as argued by Williams, and instead is a test of adequacy. *See id.* Williams's argument therefore has no merit.

{¶52} We next address Williams's argument that the substitute judge violated his rights by ruling on the admissibility of Wilson's prior inconsistent statement. Because Williams did not object on these grounds, he has forfeited all but plain error on appeal. *See* Crim.R. 52(B); *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22-23; *Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, at ¶ 39.

{¶53} Williams contends that "the question of whether impeachment is proper is a factual determination." Williams seems to suggest that this "factual determination" included a credibility assessment that the substitute judge was unable to properly perform. But the question of whether the state was surprised and whether the state had been affirmatively damaged under Evid.R. 607 had nothing to do with Wilson's credibility as a witness. This is because the substitute judge did not have to determine whether Wilson was testifying truthfully to determine whether the state could demonstrate "surprise" and "affirmative damage" under Evid.R. 607. Here, the substitute judge read the transcript of Wilson's testimony and heard arguments from the state and the defense before ruling on the admissibility of Wilson's prior inconsistent statement. We fail to find error, let alone plain error.

{¶54} Finally, Williams argues that the substitute judge violated his right to due process of law by sentencing him without presiding over his entire trial. Williams failed to object on this basis in the trial court. We therefore review his argument for plain error. *See* Crim.R. 52(B); *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860 at ¶ 22-23; *Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, at ¶ 39.

{¶55} Williams seems to argue that a per se due process violation results whenever there is a substitution of judges prior to sentencing. We find no basis in law for this argument, and Williams cites none. And we find no indication in the record that the trial court was unable to sentence Williams simply because the he did not personally view the entire trial. Further, we note that the criminal rules allow for the substitution of a trial judge for the sole purpose of sentencing even if the substitution does not occur until after a verdict is rendered. *See* Crim.R. 25(B). In sum, we find no plain error amounting to a due process violation.

{¶56} Williams' second assignment of error is overruled.

**Williams's Interview with the Police**

{¶57} In his third assignment of error, Williams argues that the trial court violated Evid.R. 403 when it allowed the state to play certain portions of Williams's first interview with police.

{¶58} Under Evid.R. 403(A), relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The decision whether to admit or exclude relevant evidence under Evid.R. 403(A) rests within the discretion of the trial court. *See State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. We will not disturb the trial court's decision to admit or exclude evidence unless the court has abused its discretion in admitting the evidence, and unless the accused has suffered material prejudice as a result. *See Martin*, 19 Ohio St.3d at 129, 483 N.E.2d 1157; *see also Blakemore*, 5 Ohio St.3d at 218, 450 N.E.2d 1140 (an abuse of discretion connotes that the trial court's judgment was unreasonable, arbitrary, or unconscionable).

{¶59} Williams argues that the court should have ordered the following statements from police to Williams to be redacted: (1) "I'm telling you right now, your girl thinks you did this," (2) "It does not look very good for you right now," (3) "the weight of this case is on you," and (4) "it looks really bad for you." Williams also contends that comments by police concerning Williams's possible sentence and statements that Williams had to prove something to the police should have been redacted.

{¶60} Upon a review of the entire taped statement, portions of which had been redacted by the state, we hold that the statements complained of were not so unfairly prejudicial as to outweigh their probative value. The police officer's comments and questions were necessary to put Williams's answers or lack of answers into context, and were therefore beneficial to the jury's overall understanding of Williams's statement. *See State v. Daniel*, 146 Ohio Misc.2d 9, 2008-Ohio-2050, 886 N.E.2d 295, ¶ 20-28 (C.P.). Further, the jury was properly instructed as to its role as the sole arbiters of Williams's guilt, and also that the state carried the burden of proof at trial. Juries are presumed to follow the trial court's instructions. *Loza*, 71 Ohio St.3d at 75, 641 N.E.2d 1082. We therefore hold that Williams has failed to demonstrate that the trial court abused its discretion in admitting these statements, or that he was materially prejudiced by their admission. This assignment of error is overruled.

**Motion for a New Trial**

{¶61} In his fourth assignment of error, Williams claims that the trial court erred by failing to grant his motion for a new trial under Crim.R. 33(A)(1). That rule provides that the trial court may grant a defendant a new trial for an irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the

court, because of which the defendant was prevented from having a fair trial. Crim.R. 33(A)(1). The decision to grant a new trial under Crim.R. 33(A)(1) is within the trial court's discretion. *State v. Davis*, 1st Dist. Hamilton No. C-090220, 2010-Ohio-5125, ¶ 41, citing *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990). Consequently, we will not reverse a decision granting or denying a new trial absent an abuse of discretion. *See Blakemore*, 5 Ohio St.3d at 218, 450 N.E.2d 1140.

{¶62} Williams contends that the trial court should have granted his motion for a new trial because of the alleged errors that he raised in his first, second, and third assignments of error. Because we have already determined that these assignments of error have no merit, we hold that the trial court did not abuse its discretion by failing to grant Williams a new trial on these grounds.

{¶63} Williams's fourth assignment of error is overruled.

**Weight and Sufficiency of the Evidence**

{¶64} In his sixth assignment of error, Williams contends that his convictions were not supported by sufficient evidence and were also against the manifest weight of the evidence.

{¶65} In a challenge to the sufficiency of the evidence, the question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *see State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36. In regard to the weight of the evidence, we review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶66} In his challenge to the sufficiency of the evidence, Williams contends that "there was no direct substantive evidence that Mr. Williams was the shooter in the homicides, and there was no substantive evidence that he was complicit in the criminal activities of another." Because Williams is only contesting that the state did not prove that Williams was the shooter or was complicit in the shooting, we limit our analysis accordingly.

{¶67} It is well-settled that the state need not present direct evidence of a crime in order to sustain a conviction. Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks* at paragraph one of the syllabus. And in this case there was overwhelming circumstantial evidence that Williams was "the shooter" in the shooting deaths of Martin and Fields. Jones, Fields's mother, placed Williams in the car with Martin and Fields hours before the shootings. Williams himself admitted that he had been in the back seat of Martin's car in the hours preceding the murders. Dr. Looman testified that both Martin and Fields had been shot in Martin's Jaguar where they were found. Martin's gunshot wound was consistent with having been shot from the back seat of his car. The bullets that killed Martin and Fields had been fired from the same gun. Minutes before the call reporting that gunshots had been heard in the area, Martin and Fields had texted each other intimate messages, suggesting that someone else had been present at that time. Upon arriving at the scene of the crime, police discovered Williams's "fresh spit" outside of Martin's driver's side door, as well as a cigarette butt with Williams's DNA on it. Police did not find any cash or personal effects on Martin. A SIM card assigned to Bazel's cell phone had been put into Martin's missing cell phone just hours after the shootings. And the state presented evidence that Williams and Bazel went on a shopping spree the afternoon following the shooting, and that Williams

spent hundreds of dollars. The taped telephone calls between Bazel and Williams from jail suggested that Williams was attempting to get his story straight concerning how he came to be in possession of Martin's cell phone. Finally, the state presented evidence that Bazel and Williams gave contradictory stories concerning when and how each had arrived at Catherine Williams's house following the shootings.

{¶68} This was sufficient evidence to show beyond a reasonable doubt that Williams was the individual who shot both Martin and Fields.

{¶69} We also find that Williams's convictions were not against the weight of the evidence. Williams claims that there was credible evidence presented that "Joker," otherwise known as Greg Summerland, had sold Martin's phone to Williams, and that there was credible evidence that Williams never returned to Martin's car after meeting Bazel at 11 p.m. on April 12, 2013. Presumably, Williams argues that the jury should have afforded more weight to this version of events. However, there is no indication that, in weighing all of the evidence presented, the jury lost its way in so as to create a manifest miscarriage of justice warranting a new trial.

{¶70} Williams's sixth assignment of error is overruled.

## Williams's Crimes were not Allied Offenses of Similar Import

{¶71} In his seventh assignment of error, Williams seems to claim that all of his offenses were allied offenses of similar import, and that the trial court therefore should have merged them into one charge for sentencing pursuant to R.C. 2941.25.

{¶72} Under R.C. 2941.25(A), a defendant may be convicted of only one of two or more allied offenses of similar import. But if the offenses are of dissimilar import or are committed separately or with a separate animus, the defendant may be convicted of all of them. R.C. 2941.25(B). We review a trial court's merger ruling de

novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. Here, Williams did not object at the sentencing hearing to the imposition of multiple sentences for his offenses. He has therefore forfeited this issue absent a showing of plain error. *See* Crim.R. 52(B); *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22-23; *Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, at ¶ 39.

{¶73} "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph one of the syllabus; *see State v. Sanders*, 1st Dist. Hamilton Nos. C-140579 and C-140580, 2015-Ohio-5232, ¶ 46.

{¶74} Turning first to the "conduct" factor, two or more offenses of dissimilar import exist when the defendant's conduct constitutes offenses involving separate victims. *Ruff* at paragraph two of the syllabus. Because Williams's aggravated murder convictions involved separate victims, they clearly are not allied offenses of similar import.

{¶75} Nor do we find Williams's aggravated murder and aggravated robbery convictions to be allied offenses of similar import. Williams was found guilty of the aggravated robbery of Martin, but not of Fields. Presumably, Williams contends that the aggravated murder and aggravated robbery of Martin should have merged for sentencing. Williams is incorrect. In *Sanders*, we held that an aggravated murder and aggravated robbery charge did not merge where the manner in which the defendant killed his victims—by shooting them at close range in the back of their heads—evidenced a specific intent to kill, separate and apart from the motive to rob them. *Sanders* at ¶ 49; *see State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-

Ohio-6716 (a shooting at close range in a victim's face and head during the course of a robbery showed a specific intent to kill separate and apart from defendant's motive in committing robbery).

{¶76} Likewise, in this case, the evidence showed that Williams committed the crimes at issue with a separate animus. Williams shot Martin in the back of his head and at close range. This conduct demonstrated a specific intent to kill, separate from his motive in robbing Martin. These offenses are therefore dissimilar in import.

{¶77} Finally, we turn to Williams's WUD charge. We have previously held that the WUD statute "manifests a legislative purpose to punish the act of possessing a firearm while under a disability separately from any offense committed with the firearm." *State v. Bates*, 1st Dist. Hamilton No. C-140033, 2015-Ohio-116, ¶ 30. Thus, Williams's WUD count is dissimilar in import to his aggravated murder and aggravated robbery charges.

{¶78} In sum, the trial court did not commit plain error—and did not err at all—in not merging any of Williams's crimes for sentencing. We therefore overrule Williams's seventh assignment of error.

**Sentencing Error**

{¶79} In his eighth and final assignment of error, Williams asserts that the trial court erred when it sentenced him because the court's sentencing entry reflects a sentence different from the one announced in court. Williams is correct.

{¶80} At William's sentencing hearing, the trial court stated that Williams was sentenced to life without parole for 30 years on each aggravated murder charge. It imposed a three-year sentence on the gun specification to count one, aggravated murder. The trial court did not impose a sentence on the gun specifications to count

two, aggravated murder, or count five, aggravated robbery. The court's sentencing entry, however, reflects that Williams was sentenced to life without parole on each aggravated murder charge, and to three-year gun specification sentences on each of counts one, two, and three.

**{¶81}** Crim.R. 43(A) provides that, "the defendant shall be present at the arraignment and every stage of the trial, including * * * the imposition of sentence." Crim.R. 43(A) embodies a defendant's due process right to be present when the court imposes sentence. *State v. Railey*, 1st Dist. Hamilton No. C-120029, 2012-Ohio-4233, ¶ 20.

**{¶82}** Williams was not physically present when the trial court imposed the harsher prison sentence reflected in the court's judgment entry. When a sentence pronounced in open court is later modified and the judgment entry reflects the modification, the modification must have been made in open court in the defendant's presence. *Railey* at ¶ 21, citing *State v. Carpenter*, 1st Dist. Hamilton No. C-950889, 1996 Ohio App. LEXIS 4434, *4 (Oct. 9, 1996); *State v. Todd*, 1st Dist. Hamilton No. C-020559, 2003-Ohio-3056, ¶ 17; *State v. Hodges*, 1st Dist. Hamilton No. C-990516, 2001 Ohio App. LEXIS 2729, *4-5 (June 22, 2001); *State v. Coach*, 1st Dist. Hamilton No. C-990349, 2000 Ohio App. LEXIS 1901 *4-8 (May 5, 2000); *State v. Griffin*, 131 Ohio App.3d 696, 699, 723 N.E.2d 606 (1st Dist.1998).

**{¶83}** Because Williams was not present when the trial court effectively modified his sentence, the sentence was imposed in violation of Williams's due process right to be present at sentencing embodied in Crim.R. 43(A). We sustain Williams's eighth assignment of error, vacate the sentences on counts one, two, and three, and remand this cause for resentencing on those counts.

## Conclusion

{¶84} In sum, we affirm the findings of guilt on all charges, but vacate Williams's sentence on counts one, two, and three, and remand this cause for resentencing on those counts.

Judgment affirmed in part, sentence vacated in part, and cause remanded.

**FISCHER, P.J.,** and **HENDON, J.,** concur.

Please note:

The court has recorded its own entry this date.